DAVID J. WARD (CSBN 239504)
LIDIA MAHER (CSBN 222253)
ANDREW J. NICHOLSON-MEADE (CSBN 284070)
U.S. Department of Justice
Antitrust Division
450 Golden Gate Avenue
Box 36046, Room 10-0101
San Francisco, CA 94102
david.ward@usdoj.gov
Telephone: (415) 934-5300

Attorneys for the United States

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JOSEPH J. GIRAUDO,<br>RAYMOND A. GRINSELL,<br>KEVIN B. CULLINANE,<br>JAMES F. APPENRODT, and<br>ABRAHAM S. FARAG,<br><br>Defendants. | **UNITED STATES' SUR-REPLY TO DEFENDANTS' MOTION TO SUPPRESS**<br><br>No. CR 14-00534 CRB<br><br>The Honorable Charles R. Breyer<br>Courtroom 6, 17th Floor<br>Date: February 11, 2016<br>Time: 10:00 a.m. |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES………………………………………………………………..ii

SUMMARY OF ARGUMENT ....................................................................................... 1

II.   ARGUMENT ........................................................................................................ 2

C.   Defendants' Motion is Moot; the Government Will Not Use Recordings .................... 8

D.   Defendants Must Identify Factual Nexus Between Specific Recordings and ................ 8

other Evidence to Prove Alleged 'Taint .................................................................. 8

E.   Defendants Must Show Nexus Between Anything Suppressed and Anything ............. 10

they Claim is Fruits Before Any Taint Hearing .................................................... 10

F.   Defendants Are Seeking Improper Discovery Through the Hearing ........................... 11

CONCLUSION ............................................................................................................... 12

1

**TABLE OF AUTHORITIES**

2

**Cases**

3

*Alderman v. United States*, 394 U.S. 165, 183 (1969)........................................................ 11

4

*Bond v. United States*, 529 U.S. 334, 338 (2000) ................................................................ 7

5

*Kee v. City of Rowlett*, 247 F.3d 206, 212 (5th Cir. 2001) ............................................. 7, 8

6

*Murray v. United States*, 487 U.S. 533 (1988) .................................................................. 11

7

*Nix v. William*, 467 U.S. 43 (1984)................................................................................... 11

8

*Rakas v. Illinois*, 439 U.S. 128, 130 n. 1 (1978).................................................................. 3

9

*Stevenson v. Florida*, 667 So. 2d 410, 411-12 (Dist. Ct. App. 1996) ................................ 8

10

*United States v. Azano Matsura*, 2015 WL 5449912 (S.D. Cal. Sept. 11, 2015) ............. 4

11

*United States v. Carroll*, 337 F. Supp. 1260, 1263 (D. D.C. 1971)................................... 8

12

*United States v. Chamberlin*, 644 F.2d 1262, 1269 (9th Cir. 1980) ................................ 11

13

*United States v. Chase*, 692 F.2d 69, 70 (9th Cir. 1982) ................................................. 10

14

*United States v. DeLuca*, 269 F.3d 1128, 1132 (10th Cir. 2001)..................................... 10

15

*United States v. Dempsey*, No. CR 89-0666, 1990 WL 77978 at **3-4 (N.D. Ill. Mar. 13, 1990) 8

16

*United States v. Holder*, 2015 WL 4401763  (S.D. Cal. July 17, 2015)............................ 3

17

*United States v. Kandik*, 633 F.2d 1334, 1335 (9th Cir. 1980)....................................... 10

18

*United States v. King,* 478 F.2d 494, 506 (9th Cir. 1973) ................................................. 3

19

*United States v. Lara-Caneda*, 2012 WL 1439166 (S.D. Cal. April 26, 2012)................. 3

20

*United States v. Lopez-Soto*, 205 F.3d 1101, 1106 (9th Cir. 2000) ................................. 11

21

*United States v. Nava-Ramirez*, 210 F.3d 2228, 1131 (10th Cir. 2000) ......................... 10

22

*United States v. Oliva*, 703 F.3d. 390, 394-95 (9th Cir. 2012)......................................... 3

23

*United States v. Padilla*, 508 U.S. 77, 81 (1993)................................................................ 5

24

*United States v. Polizzi*, 500 F.2d 856, 910 (9th Cir. 1974) ........................................... 12

25

*United States v. Singleton*, 987 F.2d 1444, 1447 (9th Cir. 1993) ..................................... 2

26

*United States v. Smith*, 155 F.3d 1051, 1060 (9th Cir. 1988) ......................................... 11

27

*United States v. Thompson*, 130 F.3d 676, 684 (5th Cir. 1997)........................................ 8

28

*United States v. Williams*, 737 F.2d 594, 616 (7th Cir. 1984) ...................................................... 10

*Wong Sun v. United States*, 371 U.S. 471 (1963) ...................................................... 11

**Statutes**

Fourth Amendment ...................................................................................................... 3

18 U.S.C.§ 2510 *et seq* (Title III) ...................................................................... 6

1

## SUMMARY OF ARGUMENT

2      Defendants seek to suppress every hour of every recording captured by audio

3  microphones placed in the middle of public foreclosure auctions on 28 separate days (hereinafter

4  "stationary recordings").  These stationary recordings captured conversations occurring at public

5  auctions, attended by dozens of people, and held in an open area.

6      Under these circumstances defendants cannot establish that they had a reasonable

7  expectation of privacy.  And defendants do not claim that they had a general expectation of

8  privacy throughout the many hours that they spent at these public auctions.  Rather, they contend

9  that despite the generally crowded and public nature of the auctions, they "took steps to create

10  zones of privacy for their conversations."  *See* Dkt. 68 at 10.  But defendants do not specify

11  which conversations they considered private, or what efforts they took to maintain their privacy.

12  Instead, they seek to suppress every minute of every recording based on their blanket assertion

13  that they created a zone of privacy in a bustling public auction.

14      Even were the court to accept defendants' premise that they can create a zone of privacy

15  in the middle of a crowded auction, defendants have the burden to factually demonstrate that

16  they had a reasonable expectation of privacy during any particular conversation they seek to

17  suppress.  Evaluating whether an individual has a reasonable expectation of privacy in these

18  circumstances is a fact-intensive inquiry, but defendants have failed to set forth the requisite

19  facts to establish they had a reasonable expectation of privacy.  Defendants have not even

20  established, with any specificity, when their voices were captured on the stationary recordings.

21      Further, defendants only have standing to suppress the conversations in which they

22  participated.  Defendants' contention that they have standing because they were "targeted" is not

23  supported by the case law.  Their theory would gut the standing limitation of any meaning.

24  Accordingly, without establishing that they were a party to a particular conversation, defendants

25  cannot establish that they had a reasonable expectation of privacy.

26      Even if defendants could show they had a reasonable expectation of privacy during

27  particular conversations at the auctions, the issue is moot.  The government does not intend to

28  use any of the stationary recordings at trial, and none of its other evidence was derived from

U.S. SUR-REPLY TO DEFS.' MOT. TO SUPPRESS
CR 14-00534 CRB

these recordings.  The stationary recordings were a small part of a much larger investigation. Months before the stationary recordings were made, the government had obtained evidence from multiple cooperators and an undercover FBI agent.  Defendants claim that the government had said it intended to use stationary recordings at trial.  That is incorrect.  In response to a request from a defendant that the government identify recordings it may use at trial in which his voice was captured, the government voluntarily disclosed a list of 145 recordings (only 12 of which were stationary recordings), totaling more than 120 hours, that it said it could draw from at trial. In making this voluntary disclosure, the government specifically said it was not an exhibit list, but rather simply an effort to cull out for defendants hundreds of hours of irrelevant recordings.

Defendants bear the burden to establish a factual nexus between any allegedly illegally obtained evidence and any other evidence they seek to suppress as tainted.  But defendants do not cite to any of the government's other evidence they seek to suppress.  Their claim that there could be fruits of these recordings is insufficient to save their motion from being moot. Defendants can no more argue that the stationary recordings wholesale tainted other evidence than they can argue that they have standing to challenge every recording, or that they had a reasonable expectation of privacy during every conversation.

In order to suppress any evidence in this case, defendants must establish that their voice was captured on a particular recording, that they had a reasonable expectation of privacy during that conversation, and that the particular recording led to other evidence.  Defendants have not done so and the Court should deny their motion to suppress.

## II.   ARGUMENT

### A.   Defendants Have Standing Only As to Recordings of Their Voices

The Supreme Court has made clear that Fourth Amendment rights are personal rights which "may not be vicariously asserted."  *Rakas v. Illinois*, 439 U.S. 128, 133 (1978). Accordingly, the defendant has the burden of proving that he has standing to contest the admissibility of any piece of evidence.  *See United States v. Singleton*, 987 F.2d 1444, 1447 (9th Cir. 1993).  In the context of recorded conversations, a defendant does not have standing to suppress evidence unless the defendant was a party to the recorded conversation or the recording

occurred on the defendant's premises.  *See United States v. King,* 478 F.2d 494, 506 (9th Cir. 1973); *United States v. Holder*, 2015 WL 4401763  (S.D. Cal. July 17, 2015) ("[d]efendant has no standing to challenge the May 2, 2014 wiretap order because she was not a participant in the conversation intercepted pursuant to this order"); *United States v. Lara-Caneda*, 2012 WL 1439166 (S.D. Cal. April 26, 2012) (a defendant may move to suppress evidence obtained through electronic surveillance only if he was a participant in the intercepted conversation, or if such conversation occurred on his premises).

Here, the defendants seek to suppress every stationary recording whether or not their voice was captured.  Defendants claim that because three of them – Giraudo, Grinsell, and Cullinane – were identified as suspected participants prior to the installation of the stationary recording devices, they have standing because they were "targeted."  Dkt. 68 at 6.  But the Supreme Court has expressly rejected the "target theory" of standing advanced by the defendants.  *See Rakas,* 430 U.S. at 132-33 ("Adoption of the so-called 'target' theory advanced by petitioners would in effect permit a defendant to assert that a violation of the Fourth Amendment rights of a third party entitled him to have evidence suppressed at his trial.").

Defendants' reliance on *United States v. Oliva*, 703 F.3d. 390 (9th Cir. 2012), in support of their sweeping standing proposition is misplaced.  In *Oliva*, the government had a wiretap order seeking to record conversations from specific cell phones they believed were being used by the defendant.  Although the defendant refused to admit his voice was recorded, the court nonetheless held he had standing because he was specifically named as the target of the intercept in the wiretap application, which was for specific cellular phones he was personally using.  *Id.* at 394-95.

But the holding in *Oliva* is narrow and did not "implicitly overrule" previous case law on standing.  *See United States v. Azano Matsura*, 2015 WL 5449912 at *5 (S.D. Cal. Sept. 11, 2015).  As the court in *Azano* stated, *Oliva* did not adopt a "per se rule of standing to a defendant merely because he is the target, rather than the victim, of a search and seizure."  *Id.*  Instead, the defendant in *Oliva* was accorded standing because he was "the primary user of the target telephones and a participant in the intercepted conversations."  *Id.*

1    Like *Azano,* in this case the defendants may not suppress the conversations in which they

2    were not participants.  Of the ten recordings the defendants identified in their Motion to

3    Suppress, defendants allege that Grinsell appears in one recording, Giraudo appears in another,

4    and Cullinane appears in two others.  *See* Dkt. 59, Exs. F, G, H, I, J, K, L, M, N, O, and P.  The

5    defendants do not identify any recordings in which Appenrodt or Farag appear.  Even if the court

6    were to accept defendants' "target theory" of standing, it would not help Appenrodt or Farag.

7    Appenrodt is not even captured on stationary recordings until March 2010 – three months after

8    the FBI began placing stationary recordings at the auctions.  Dkt. 69, Ex. B. Defendant Farag is

9    captured in the background of a handful of video surveillance recordings at the auctions at the

10   time, but not even heard in a stationary recording until January 2010.  Dkt. 69, Ex. B.  They were

11   not targets of the surveillance – they weren't even subjects at the time.

12   Defendants contend that precluding Farag and Appenrodt from challenging the stationary

13   recordings might necessitate severance and separate trials.  Dkt. 68 at 7 n.3.  Given that the

14   government does not intend to use any of the stationary recordings, severance is not necessary.

15   Defendants next contend that they should be granted standing to challenge every

16   stationary recording because they should not have to bear the burden of listening to all of them.

17   Dkt. 68 at 7.  They claim that the low quality of the audio recordings "makes it difficult, if not

18   impossible, for Defendants to discern with any reasonable certainty whose voices were

19   overheard."  Dkt. 68 at 7 n.4.  This is true; many of the audio recordings are of low quality, and

20   in fact in many cases, voices are indistinct and unidentifiable (which is at least partly why the

21   government does not intend to use them at trial).  But this does not support a claim that

22   defendants have standing to challenge every recording; a defendant can hardly claim his voice

23   was captured when the recording is indiscernible.

24   Moreover, not every recording is completely indiscernible, and in some instances the

25   government was able to identify specific individuals in some recordings, and it has already

26   voluntarily identified to the defendants which specific defendant appears in a stationary

27   recording for almost half of the stationary recordings.  Dkt. 68, Ex. B.

28

U.S. SUR-REPLY TO DEFS.' MOT. TO SUPPRESS
CR 14-00534 CRB

The defendants have had all of the recordings made in this case since December 2014. They have had the government's list of every potentially material recording in which their client appears since May 2015. They cannot now claim that because they have not reviewed the remainder, or can't discern voices on some, that the rules of standing should not apply.

As the Supreme Court has held, Fourth Amendment rights are personal ones and a defendant must demonstrate that his or her rights were violated to suppress evidence. *See United States v. Padilla*, 508 U.S. 77, 81 (1993). Accordingly, each defendant's challenge to these recordings must be limited to those recordings in which he appears. To hold otherwise would be to gut the standing requirement of any meaningful limitation.

**B.     Defendants Have Not Shown That their Fourth Amendment Rights Were Violated**

Even in the certain instances where defendants do allege their voices were captured on the stationary recordings, they have failed to establish that they had a reasonable expectation of privacy during those conversations. It is well settled that "[w]hat a person knowingly exposes to the public . . . is not a subject of Fourth Amendment protection," *Katz v. United States*, 389 U.S. 347, 351 (1967), and here, defendants have not established that they did not expose their conversations for the public to hear.

Contrary to defendants' assertion, the government does not advocate for an "indoor-outdoor" rule with respect to privacy rights. Dkt 68 at 9 n.6. However, defendants cannot establish a reasonable expectation of privacy at or around the time of these crowded public auctions, which were held in an open space where county employees, uniformed law enforcement, and any and all bidders who wished to attend regularly passed by. The openness of the auctions, the defendants' proximity to others, and the volume at which recorded conversations were spoken render any expectation of privacy defendants may have had unreasonable. *See Kee v. City of Rowlett, Texas*, 247 F.3d 206, 213-15 (5th Cir. 2001).

Recognizing the public nature of the auctions, defendants do not contend that they had a reasonable expectation of privacy during every recorded conversation at every auction. Rather, defendants assert "that they took various affirmative steps to protect their discussions at the

1    courthouse, such as moving away from others, standing close together, covering their mouths,

2    and speaking in low volumes."  Dkt. 68 at 8.  Defendants cite to ten snippets of conversations

3    contained in longer recordings, and they claim that in those instances they had taken steps to

4    conceal their conversations in a way that would be sufficient to grant them a reasonable

5    expectation of privacy.  Dkt. 59 at 2-3.  From this, they seek to suppress every stationary

6    recording.  But in order to establish that they had a reasonable expectation of privacy, defendants

7    must identify at the very least whether they were in close proximity to others, how many people

8    were present, and what steps they took to keep their conversations private.  *See Kee v. City of*

9    *Rowlett*, 247 F.3d 206, 212 (5th Cir. 2001).

10         Defendants have not done this.  For example, defendants assert that individuals were

11    captured "having private conversations on their cell phones in an area away from the auctions,"

12    and that "in one instance, the Government was able to capture an alleged co-conspirator talking

13    on his cell phone with the other party to the call partially audible through the cell phone's

14    receiver."  Dkt. 58 at 9-10 (citing Dkt. 59, Ex. G).

15         However, photos from the time of that conversation show the co-conspirator was talking

16    on a chair that was placed in the middle of the crowd of people gathering for the auctions, and

17    the conversation the defendants described occurred during the middle of an auction.  *See*

18    Declaration of David J. Ward ("Ward Decl"), Ex. A.  In fact, the auctioneer can clearly be heard

19    on the audio recording.  Dkt. 59, Ex. G.  Myriad other voices can also be heard.  *Id.*  It is the

20    cacophony of a public auction.

21         The recording does capture – though it is mostly inaudible – a voice that sounds like it is

22    from a cell phone.  *Id.*  But the photo taken when this call was taking place shows that the co-

23    conspirator was holding the device in his hand as opposed to against his ear.  Ward Decl., Ex. A.

24    In all likelihood, the call was on speakerphone.

25         It cannot be that in this situation, this co-conspirator had a reasonable expectation of

26    privacy for a conversation he was having in the middle of a crowded and ongoing foreclosure

27    auction when he was surrounded by more than a dozen people.  This is an example of why

28    defendants' attempt at a blanket suppression order is inappropriate.

U.S. SUR-REPLY TO DEFS.' MOT. TO SUPPRESS
CR 14-00534 CRB

6

1       Moreover, defendants are citing to conversations of co-conspirators.  They do not have

2  standing to move to suppress those conversations to which they were not a party.

3       Further, the technological limitations of the recording devices weigh against a finding

4  that defendants had an expectation of privacy during the conversations that were actually picked

5  up by the recording devices and are audible.  The microphones used in the recording devices cost

6  $23, are publicly available, and could not detect sound below a human whisper.  Dkt. 59, Ex. E.

7  Thus, while the use of "technological enhancements to hear the communications" is a factor in

8  analyzing a reasonable expectation of privacy, *Kee*, 247 F.3d at 217, this is not a case in which

9  the government used "bionic ears," or technologically sound-enhancing devices which could

10  detect sounds inaudible to human ears.  *See, e.g., Stevenson v. Florida*, 667 So. 2d 410, 411-12

11  (Fla. Dist. Ct. App. 1996); *see also United States v. Carroll*, 337 F. Supp. 1260, 1263 (D. D.C.

12  1971) (holding that recording conversations from a permissible location with an inexpensive

13  device no more sensitive than the human ear, generally available to the public, did not violate

14  Title III).

15      Defendants contend that "various post-recording techniques … could improve the

16  audibility of the recordings."  Dkt. 68 at 13.  But such post-recording techniques do not have

17  bearing on whether the recording violated the Fourth Amendment.  *See United States v.

18  Dempsey*, No. CR 89-0666, 1990 WL 77978 at **3-4 (N.D. Ill. Mar. 13, 1990) (holding that the

19  only kind of "enhancement-by-tape-recorder" relevant under the Fourth Amendment is whether

20  the recording device "amplified the volume of sound" beyond what was audible to the human ear

21  from the location of the recording device).  Indeed, the post-processing of audio recordings to

22  make recorded conversations more intelligible is permissible.  *See United States v. Thompson*,

23  130 F.3d 676, 684 (5th Cir. 1997).  Therefore, whether the intelligibility of the recordings could

24  be improved is irrelevant because under no circumstances could "post-recording techniques"

25  make audible sounds which were below a human whisper.

26  //

27  //

28  //

U.S. SUR-REPLY TO DEFS.' MOT. TO SUPPRESS
CR 14-00534 CRB

7

### C.   Defendants' Motion is Moot because the Government Will Not Use Stationary Recordings at Trial

The government does not intend to use at trial any of the stationary recordings made in this case.  The recording devices used a publicly available microphone and recorded conversations that occurred outdoors and in a public setting – often during auctions in which dozens of people were within feet of where the microphones were placed.  The recordings were often of low quality (a fact noted by defendants in their Reply, *see* Dkt. 68 at 7 n. 4 (complaining it is "difficult, if not impossible, for Defendants to discern with any reasonable certainty whose voices were overheard" on the audio recordings)).  In fact, little of use was captured on the stationary recordings, as evidenced by the fact that they were not used in search warrant applications or before the grand jury, or cited in the Indictment.

Defendants attempt to claim that a May 22, 2015 letter from the government cataloguing 145 recordings (including 12 stationary recordings) and who was captured on them was, in fact, a list of recordings the government intended to use at trial.  Dkt. 68 at 4.  This is incorrect.  The letter was sent in response to a request by defendant Appenrodt, and was a voluntary disclosure made in an effort help defendants narrow their review of evidence.  But the list – 145 recordings totaling over 120 hours – was not an exhibit list.  In fact, the letter specifically says that it "should not be construed as an exhibit list." Dkt. 69, Ex. A.  Rather, it was a voluntary effort by the government to exclude for the defendants hundreds of hours or irrelevant recordings.  As the government continued its review of the stationary recordings, it became clear there was little of evidentiary value, and the government has concluded it will not use any of the recordings at trial.

### D.   Defendants Must Identify a Factual Nexus between Specific Recordings and Other Evidence to Prove Alleged Taint

Defendants claim that even though the government does not intend to use any of the stationary recordings, their motion is not moot because other evidence may be fruits of those recordings.  Dkt. 68 at 3.  But defendants have not cited to any evidence that was allegedly derived from the stationary recordings and defendants bear the burden to show a "nexus" between the stationary recordings and any other evidence.  *United States v. Kandik*, 633 F.2d

1   1334, 1335 (9th Cir. 1980); *see also United States v. DeLuca*, 269 F.3d 1128, 1132 (10th Cir.

2   2001) (citing *United States v. Nava-Ramirez*, 210 F.3d 1128, 1131 (10th Cir. 2000)).

3       Defendants' conclusory assertions that more than 200 hours of recordings must have

4   tainted other evidence fails to establish such a nexus.  And as discussed *supra,* defendants do not

5   contend that their voices were captured, or that they had a reasonable expectation of privacy, on

6   every conversation captured on the stationary recordings.  There cannot be "fruits" of recordings

7   that were obtained lawfully.

8       Defendants have identified ten recordings in support of their claim that they had an

9   expectation of privacy.   *See* Dkt. 59, Exs. F, G, H, I, J, K, L M, N, O, and P.  For six of the

10  recordings, defendants are not captured, and a defendant cannot use evidence which he did not

11  have standing to challenge to subsequently argue it led to other evidence that must be

12  suppressed.  *See United States v. Chase*, 692 F.2d 69, 70 (9th Cir. 1982); *United States v.*

13  *Williams*, 737 F.2d 594, 616 (7th Cir. 1984).  For the recordings in which one of the defendants

14  was captured, defendants do not claim that there is anything incriminating captured.  For

15  example, defendants cite to a video and audio recording of defendant Giraudo talking into his

16  cell phone.  *See* Dkt. 59, Ex. F.  But Giraudo's voice is unintelligible.  There can be no fruits of

17  an unintelligible conversation.

18      Despite their admission that many of the recordings are unintelligible, and despite the fact

19  they have identified no relevant recordings, defendants nonetheless claim that it is "an

20  astonishing statement" for the government to state that it did not derive evidence from any of the

21  stationary recordings, and if not, then "why is this case proceeding?"  Dkt. 68 at 13.

22      The case is proceeding because the government has developed, independent of the

23  stationary recordings, overwhelming evidence that these defendants were engaged in long-

24  running bid-rigging and fraud schemes that resulted in collusion on the auction of dozens of

25  properties, illicit payoffs, and a scheme to fraudulently acquire title to foreclosed properties and

26  divert monies to themselves that should have rightfully gone to others.  *See* Dkt. 1.

27      The investigation began with the cooperation of two individuals who described in

28  significant detail the workings and mechanics of the conspiracy months before any stationary

U.S. SUR-REPLY TO DEFS.' MOT. TO SUPPRESS
CR 14-00534 CRB

recording devices were used.  *See* Dkt. 62-1, Ex. B.  The government had also recorded evidence of collusive agreements, including three cash payoffs totaling $20,000 to defendant Giraudo, again, all before stationary recording devices were used.  *Id.* at Exs. R and T.  When the investigation went overt, search warrants were obtained, none of which relied on the contents of the stationary recordings.  *See* Dkt. 62 at 17.  No stationary audio recordings were used in a presentation to the grand jury in this matter.  *Id.*

Evidence is not fruits of improperly-obtained evidence if it: (1) was obtained through a source independent from the tainted evidence, *Murray v. United States*, 487 U.S. 533, 537 (1988), *United States v. Chamberlin*, 644 F.2d 1262, 1269 (9th Cir. 1980); (2) would have been inevitably discovered, *Nix v. William*, 467 U.S. 431, 447 (1984); *United States v. Lopez-Soto*, 205 F.3d 1101, 1106 (9th Cir. 2000); or (3) if the chain of causation between the improperly obtained evidence and additional evidence is too attenuated, *Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963), *United States v. Smith*, 155 F.3d 1051, 1060 (9th Cir. 1988).

The evidence the government relied on in this case and intends to introduce at trial was obtained from independent sources such as cooperators, consensual recordings and seized and subpoenaed documents.  Much of the information regarding the crimes for which defendants were charged was also well known by the time the stationary recording devices were used.  The information that was not known would have inevitably been discovered over the course of the investigation given what was known at the outset.  And any evidence from cooperators or others, obtained months or years after the stationary recording devices were no longer in use, is far attenuated from the stationary recordings.  There are no fruits from the stationary recordings.

**E.     Defendants Must Show a Nexus between Anything Suppressed and Anything They Claim is Fruits before Any Taint Hearing**

Defendants claim that if any of the stationary recordings are suppressed, then the taint issues "will need considerable attention in a subsequent hearing."  Dkt. 68 at 1.  Again, defendants have it backwards.  They are asking this Court to engage in a sweeping, general inquiry without first meeting its requirements that they identify with specificity evidence which they believe may have been tainted by evidence that has been suppressed.  *See Alderman v.*

U.S. SUR-REPLY TO DEFS.' MOT. TO SUPPRESS
CR 14-00534 CRB

*United States*, 394 U.S. 165, 183 (1969).  Defendants cite to *Alderman*, and claim that they need not establish this nexus prior to a taint hearing. Dkt. 68 at 14.  In *Alderman*, the Court ordered the government to turn over to the defendant any evidence that could be fruits of the suppressed wiretaps. *Alderman*¸ 394 U.S. at 183.  The whole reason for this order was so that the defendants could identify, prior to any taint hearing, evidence they believed was fruits of the suppressed evidence. *Id.*

Defendants next quote *United States v. Polizzi*, 500 F.2d 856, 910 (9th Cir. 1974), for the uncontroversial assertion that a court, at an Alderman hearing, must decide whether evidence is tainted by evidence obtained as part of an illegal search.  But *Polizzi* makes clear that it is the defendant "who must go forward with specific evidence demonstrating taint . . . *then* the burden shifts to the government to show that it acquired its evidence from an independent source." *Id.* (italics added).

### F.      Defendants Are Seeking Improper Discovery through the Hearing

It appears that defendants intend to use the upcoming evidentiary hearing to attempt to obtain improper discovery, to question the agents about separate investigations, and to otherwise tread into irrelevant and improper subject areas.  On December 22, 2015 defendants subpoenaed FBI Agent Roahn Wynar, who directed the covert investigation, to testify at the suppression hearing.  The FBI has accepted service of the subpoena, and in fact the government intends to call him as a witness at the suppression hearing.  Defendants have now also issued subpoenas for two other FBI agents involved in the investigation.

In a *Touhy* Declaration accompanying all three subpoenas, counsel for defendants list five pages of "facts" that defendants expect to question the agents about at the hearing.  These include questions about separate foreclosure auction investigations, questions about foreclosure auction investigations that never occurred, and a host of questions related to discovery, including: the identification number used for each recording, the nomenclature system used to identify the recordings, how the recordings were converted to .wav or .avi files, whether there were any deletions or alternations to the recordings, and the process the government used to store the recordings, among other matters.

U.S. SUR-REPLY TO DEFS.' MOT. TO SUPPRESS
CR 14-00534 CRB

1    The hearing scheduled for February 11, 2016 is a suppression hearing, and the

2 government respectfully asks this Court to bar the defendants from using it to obtain improper

3 discovery, or to question the government's case agents on irrelevant topics.

4                                    **CONCLUSION**

5    For the reasons set forth above, the United States respectfully requests that the Court

6 deny defendants' Motion to Suppress or, in the alternative, hold that it is moot.

7

8 Dated:  January 18, 2016                    Respectfully submitted,

9                                             */s/ David J. Ward*
                                             David J. Ward
10                                            Lidia Maher
                                             Andrew J. Nicholson-Meade
11                                            Antitrust Division
                                             U.S. Department of Justice
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

U.S. SUR-REPLY TO DEFS.' MOT. TO SUPPRESS
CR 14-00534 CRB
                                   12