DAVID J. WARD (CSBN 239504)
LIDIA MAHER (CSBN 222253)
ANDREW J. NICHOLSON-MEADE (CSBN 284070)
E. KATE PATCHEN (NYRN 4104634)
U.S. Department of Justice
Antitrust Division
450 Golden Gate Avenue
Box 36046, Room 10-0101
San Francisco, CA 94102
andrew.nicholson-meade@usdoj.gov
Telephone: (415) 934-5300

Attorneys for the United States

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JOSEPH J. GIRAUDO,<br>RAYMOND A. GRINSELL,<br>KEVIN B. CULLINANE,<br>JAMES F. APPENRODT, and<br>ABRAHAM S. FARAG,<br><br>Defendants. | **UNITED STATES' OPPOSITION TO DEFENDANTS' POST-HEARING BRIEF IN SUPPORT OF MOTION TO SUPPRESS**<br><br>No. CR 14-00534 CRB |

TABLE OF CONTENTS

TABLE OF AUTHORITIES……………………………………………………………..iii

INTRODUCTION ..................................................................................................... 1

STATEMENT OF FACTS ........................................................................................ 3

A.   The Government Opens an Investigation into Bid Rigging and Fraud at Public Real Estate Foreclosure Auctions in San Francisco and San Mateo Counties........................... 3

B.   The San Mateo County Foreclosure Auctions Are Attended by Dozens of People and Conducted in an Open and Public Space Where Conversations Can Be Overheard. ......... 4

C.   The FBI Places Stationary Recording Devices, Less Sensitive Than a Human Ear, at the Center of the Auction Area. ................................................................................. 6

D.   The Stationary Recordings Do Not Yield Much of Evidentiary Value and Are Not Used to Further the Investigation. ................................................................................. 8

ARGUMENT ............................................................................................................. 9

I.    A Person Does Not Have Presumption of Privacy in Public Space. .................................. 9

II.   Defendants Improperly Seek Blanket Suppression of Every Stationary Recording Without Conducting a Fact-Specific Analysis. ................................................................ 11

III.  Defendants Cannot Establish They Had a Reasonable Expectation of Privacy for Conversations of Which They Were Not Part. ....................................................... 12

IV.   Defendants Cannot Establish They Had a Reasonable Expectation of Privacy for Conversations in Which They Spoke Loudly or in Close Proximity to Others................ 14

V.    Defendants Have Not Shown They Were Recorded by a Stationary Device When They Took Sufficient Steps to Maintain Their Privacy. .......................................... 16

VI.   Defendants' Declarations Do Not Establish They Had a Subjective Expectation of Privacy, and Defendant Farag's Declaration Was Stricken........................................... 20

VII.  The Requirements of Necessity and Minimization Under Title III Are Not Relevant to Defendants' Motion to Suppress........................................................................ 22

VIII. Defendants Must Establish a Factual Nexus Between a Specific Allegedly Unlawful Recording and Allegedly Tainted Evidence. ....................................................... 23

i

CONCLUSION................................................................................................................. 24

1

TABLE OF AUTHORITIES

2

**Cases**

3

*Brigham City, Utah v. Stuart*, 547 U.S. 398, 404 (2006) .................................................. 11

4

*John Doe Trader Number One*, 894 F.2d 240 (7th Cir. 1990) ....................................... 14

5

*Katz v. United States,* 389 U.S. 347 (1967) ..................................................................... 2, 10

6

*Kee v. City of Rowlett, Texas*, 247 F.3d 206 (5th Cir. 2001) ............................... passim

7

*O'Connor v. Ortega*, 480 U.S. 709 (1987) ........................................................................ 10

8

*Rakas v. Illinois*, 439 U.S. 128 (1978) .................................................................. 10, 12, 13

9

*United States v. Azano Matsura*, 129 F. Supp.3d 975 (S.D. Cal. 2015) ................... 12

10

*United States v. Baskin*, 424 F.3d 1, 4 (1st Cir. 2005) .................................................. 22

11

*United States v. Bennett*, 219 F.3d 1117 (9th Cir. 2000) ............................................ 23

12

*United States v. Canales Gomez*, 358 F.3d 1221 (9th Cir. 2004) .............................. 23

13

*United States v. Deleston*, No. 15-CR-113 PKC, 2015 WL 4745252 *5 (S.D.N.Y. 2015) .......... 22

14

*United States v. Glover*, No. 07-015204, 06 (ESH), 2016 WL 1273171, at *9 (D.D.C. Mar. 31,

15

2016) ........................................................................................................................ 12

16

*United States v. Jackson*, 588 F.2d 1046 (5th Cir. 1979) ..................................... 10, 14

17

*United States v. Kandik*, 633 F.2d 1334 (9th Cir. 1980) ............................................ 24

18

*United States v. King*, 478 F.2d 494 (9th Cir. 1973) ........................................ 10, 12, 13

19

*United States v. McGuire*, 307 F.3d 1192 (9th Cir. 2002) .......................................... 23

20

*United States v. Oliva,*705 F.3d 390 (9th Cir. 2012) .................................................... 12

21

*United States v. Polanco,* 37 F. Supp. 2d 262 (S.D.N.Y. 1999) ............................... 22

22

*United States v. Salemme*, 91 F. Supp. 2d 141 (D. Mass. 1999) ............................. 10

23

*Wren v. United States*, 517 U.S. 806 (1996) ................................................................... 11

24

**Statutes**

25

Title III of the Omnibus Crime Control and Safe Streets Act 18 U.S.C. §§ 2510 et seq. ..... passim

26

27

28

# INTRODUCTION

Defendants seek to suppress more than 200 hours of audio recordings made by stationary devices placed at the center of well-attended public real estate foreclosure auctions.  While private conversations in a public place are possible, at these open and crowded foreclosure auctions, defendants are not entitled to a presumption of privacy for their conversations.  In order to establish a Title III or Fourth Amendment violation, the defendants are required to show, through a fact-intensive inquiry, that they maintained a reasonable expectation of privacy for each conversation they are seeking to suppress.  They have not done so.

Establishing a reasonable expectation of privacy amidst the crowds of people at the public auctions requires an analysis of the place of the communication and the proximity to others or potential to be overheard, the volume of the conversation and the affirmative steps taken by the speaker to shield his conversation, the potential for the communication to be reported, and the quality of the recording device that captured the conversation.  *Kee v. City of Rowlett, Texas*, 247 F.3d 206, 213-15 (5th Cir. 2001).  Such a fact-specific analysis does not support the suppression of every minute of more than 200 hours of recordings made over 28 days.

Defendants' failure to engage in the fact-intensive privacy inquiry is evident because their motion seeks to suppress every recording without regard to context, including the many conversations in which a defendant was not a participant to the conversation, or the many conversations in which the defendants spoke at a normal volume in close proximity to bystanders.  After a three-day hearing and multiple briefs, defendants have only identified portions of three recordings in which a defendant participated in a conversation recorded by a stationary device.  And the factual circumstances surrounding the three clips cited by defendants show that any expectation of privacy in those conversations was unreasonable.  Further, none of the clips cited by defendants capture conversations of either defendant Farag or Appenrodt.

The record indicates that little about these auctions was private.  They were conducted outside and in the open.  They were attended by dozens of people and even more people regularly passed by.  Auction participants stood close together, carried on conversations during

U.S. OPP'N TO DEFS.' MOT. TO SUPPRESS
CR 14-00534 CRB

the auction, and had to speak loudly to be heard.  An FBI agent who attended the auctions stated he could walk up to people and listen in.  And, the defendants engaged in collusive discussions in close proximity to other auction attendees.

In contrast with the privacy afforded by the closed phone booth analyzed in *Katz v. United States,* 389 U.S. 347 (1967), and relied upon by defendants in support of their motion, the setting of the auction and the conduct of its participants show that the potential to be overheard was ever-present.  Defendants have not established that when they took the significant affirmative steps necessary to maintain their privacy, their conversations were nevertheless recorded by the stationary devices.  On the contrary, in the instances where defendants whispered or left the auction area, those conversations were not captured by the stationary devices.

The declarations submitted by the defendants are inconsistent with their sweeping motion because they fail to identify any recording in which they were recorded while attempting to maintain privacy through whispers or hushed conversations.  Instead, defendants' declarations establish that the defendants, at times, did not consider their conversations at the auctions to be private because they understood they had to leave the auction area or whisper to maintain privacy.  And Abraham Farag, whose declaration was stricken after he elected not to attend the suppression hearing that would have subjected him to cross-examination, has failed to present any evidence of his subjective expectation of privacy.  Yet the defendants seek to suppress every recording.

Defendants ignore the fact-intensive inquiry required to establish their reasonable expectation of privacy.  Instead they challenge the government's process and legal justification for using the stationary recordings, untethered to the recordings themselves.  For this reason, their motion to suppress should be denied.  Further, because the government is not using any of the stationary recordings, even were the Court to find a recording to have been obtained in violation of Title III or the Fourth Amendment, any issues of taint must be limited to that particular recording.

*//*

*//*

U.S. OPP'N TO DEFS.' MOT. TO SUPPRESS
CR 14-00534 CRB

**STATEMENT OF FACTS**

**A.    The Government Opens an Investigation into Bid Rigging and Fraud at Public Real Estate Foreclosure Auctions in San Francisco and San Mateo Counties.**

In October 2009, two participants at public real estate foreclosure auctions in San Francisco and San Mateo counties came forward to the government to report rampant corruption at these trustee sales.  Suppression Hr'g Tr. ("Tr.") 181:2-11, Feb. 11, 2016.  Based on the information they provided, the FBI began investigating.  *Id.* at 181:12-14, 182:10-15.  The agents conducted surveillance of the auctions and debriefed the cooperators, developing evidence of widespread collusion at the auctions.  *Id.* at 65:4-14, 56:11-15.  In order to obtain evidence of this collusion at the San Mateo County auctions, one of the cooperators agreed to wear a recording device and record conversations with the suspects.  *Id.* at 66:15-17.  In addition, an undercover FBI agent began posing as an investor for one of the cooperators and consensually recorded his interactions with members of the conspiracy.  *Id.* at 181:15-25.  These consensual recordings rapidly corroborated the information provided by the cooperators.  *Id.* at 183:5-9. One of the cooperators and the undercover FBI agent were able to capture approximately 272 hours of consensual recordings over 162 days at the San Mateo County auction. See Gov't Exs. 32, 44, 54, 60, and 63.  These recordings provided substantial evidence of fraud and bid rigging at these auctions.

Within the first two-and-a-half months of the investigation, defendants Giraudo, Grinsell, and Cullinane, along with Daniel Rosenbledt and Mohammed Rezaian, had been identified as suspects, along with other individuals.  Tr. 58:5-22, Feb. 11, 2016; Suppression Hr'g Tr. ("Tr.") 156:11-15, Feb. 29, 2016; Def. Ex. 17.  Additionally, within the first two-and a half-months, three separate cash payments were made to Giraudo in connection with a property located in Daly City.  Tr. 67:13-17, Feb. 11, 2016.  These payoffs were captured on the cooperator's and undercover agent's consensual recording devices.  Decl. of Roahn Wynar ("Wynar Decl.") ¶6(a), Dec. 14, 2015.

Over time, the cooperator's relationship with Giraudo's group soured.  *See* Tr. 56:16-23, Feb. 11, 2016.  This "sour relationship" with many of the conspirators prevented the cooperator

1    from overhearing certain conversations among Giraudo's group at the auction.  *Id.*; *see id.* at

2    148:18-25. The FBI hoped that the source would be able to rehabilitate his relationship with the

3    conspirators, but also set up stationary recording devices at the San Mateo County auction site in

4    December 2009 with the goal that they would provide additional evidence of the conspiracy.  *Id.*

5    at 43:17-24, 56:11-23, 65:25-66:4.  In addition to using the stationary devices, the FBI continued

6    to gather evidence through the cooperator and undercover agent.  *See id.* at 56:7-15.  By January

7    6, 2010, defendant Abraham Farag was identified as a suspect, and by March 29, 2010,

8    defendant James Appenrodt was identified.  Tr. 185:14-17, 196:16-22, Feb. 29, 2016.

9    **B.    The San Mateo County Foreclosure Auctions Are Attended by Dozens of People and
         Conducted in an Open and Public Space Where Conversations Can Be Overheard.**

10

11        The San Mateo County foreclosure auctions took place in Redwood City, on Marshall

12   Street, in front of an employee entrance to a building.  Tr. 183:15-184:4, Feb. 11, 2016.  The

13   trustee sales typically began around 12:30 p.m.  *Id.* at 187:14-16.  Bidders would arrive around

14   ten to thirty minutes before the auction.  *Id.* at 187:17-19.

15        The trustee sales were open out-cry auctions where the auctioneer would yell out

16   properties offered for sale.  *Id.* at 197:5-12.  Bidders would then yell out their bids.  *Id.* at

17   197:13-21.  The auctioneers would typically stand in three general places at the auctions: to the

18   left of a pillar with their backs against the wall of the building; sitting or standing on a bench

19   next to a sprinkler box against the wall of the building; and to the right of the bench next to a

20   planter box.  *See id.* at 188:9-189:4.  Bidders would stand all around the area as far back as the

21   employees' entrance to the building.  *Id.* at 189:5-14.

22        The area from the wall of the building to the inside of a set of pillars measures

23   approximately 13 feet.  From the outside of the pillars to the end of the curb measures an

24   additional 13 feet.  *Id.* at 189:18-24.  The auction area was not enclosed and people could enter

25   and exit the area without restriction.  Suppression Hr'g Tr. ("Tr.") 30:1-10, Apr. 5, 2016.  A

26   pillar in the auction area could obscure people that attended the auction.  *See* Tr. 59:14-17, Feb.

27   29, 2016; *see also* Tr. 53:1-15, Apr. 5, 2016.

28   / /

4

The auction was the only scheduled event occurring in the area, but employees of the building and other people using the sidewalk routinely walked by.  *See* Tr. 110:8-13, 194:24-195:7, Feb. 11, 2016.  In 2009 and 2010, on a typical auction day, between five and ten properties were auctioned for sale.  *Id.* at 198:12-15.  Bidders did not know in advance the order in which properties would be sold and had to be present at the beginning of the auction to be sure they were there when a particular property was called for sale.  *Id.* at 198:22-199:7.

In 2009 and 2010, the auctions were typically attended by as many as 30 people.  *Id.* at 192:5-10.  Anyone was permitted to attend or observe the auctions and people were free to move about the area.  *Id.* at 197:22-25; Tr. 52:3-5, Apr. 5, 2016.  Regular auction participants knew some of the other bidders, but were not familiar with every auction participant.  *See* Tr. 42:6-24, Apr. 5, 2016.  During the auctions, people would stand close together, sometimes just two to three feet apart from one another.  Tr. 192:11-16, Feb. 11, 2016; *see also* Tr. 33:15-20, Apr. 5, 2016.  During the sale, some bidders stood within two or three feet of the auctioneer.  *See* Tr. 37:20-22, Apr. 5, 2016.  While the bidding was in progress, the auction participants often engaged in conversations apart from the actual bidding.  *Id.* at 41:8-22.  Sometimes in order to be heard at the auctions, participants had to speak loudly.[1]  *Id.* at 41:23-25.

Because of the crowded nature of the auctions, attendees could overhear conversations occurring there.  Special Agent Ronan Byrne, who attended the auctions on multiple days, overheard conversations at the auctions.  Tr. 204:7-9, 209:11-12, Feb. 29, 2016.  Agent Byrne did not recall instances where individuals at the auctions stopped talking or moved to another location when he approached their conversation.  *Id.* at 204:22-205:4, 208:25-209:1.  Rather, Agent Byrne "could walk up to certain people and listen in."  *Id.* at 204:22-205:4.  Special Agent Byrne recalled overhearing portions of a particular discussion between coconspirator Daniel Rosenbledt and Dick Goodell, who provided information about the auctions to Rosenbledt.  *Id.* at 210:23-211:7.  Special Agent Roahn Wynar, who conducted visual surveillance across the street from the auctions, observed the defendants negotiate payoffs with cooperators, each other, and

---

[1]     Defendant Grinsell testified that he had to speak louder than other auction attendees.  Tr. 42:3-5, Apr. 5, 2016

U.S. OPP'N TO DEFS.' MOT. TO SUPPRESS
CR 14-00534 CRB

unknown third parties during the auctions, in close proximity to other attendees. *See id.* at 30:16-22.  Special Agent Wynar's observations were confirmed by auction participants who, when interviewed by the FBI, confirmed that the bid-rigging and fraudulent conduct occurring at the auctions was open, observable, and obvious. *Id.* at 33:14-25.

## C.   The FBI Places Stationary Recording Devices, Less Sensitive Than a Human Ear, at the Center of the Auction Area.

In December 2009, the FBI began using stationary audio and video recording devices placed in the area of the San Mateo County auctions to capture additional evidence of the criminal conduct under investigation.  Tr. 43:17-24, Feb. 11, 2016.  Between December 22, 2009 and September 15, 2010, the stationary devices were activated on 28 days.[2]  *Id.* at 47:10-20.  The devices were activated roughly a half-hour before the auction began and turned off after the bidders had dispersed from the area.  *Id.* at 208:9-20.

The locations of the stationary devices were chosen in part to triangulate the densest part of the trustee sales.  *Id.* at 206:23-207:4.  Accordingly, the stationary devices were typically placed in three locations positioned around the auctioneer: a planter box eight to ten feet from where the auctioneer would typically stand; a sprinkler control box ten to 13 feet from where the auctioneer would stand; and in an unmarked police car approximately 31 feet from where the auctioneer would stand.  *Id.* at 205:2-14, 206:4:8.  In one instance in January 2010, the FBI activated an additional stationary recording device contained in a backpack that Special Agent Byrne placed next to a pillar in the center of the auction area.  Tr. 200:4-8, 202:18-24, Feb. 29, 2016.

---

[2]    Defendants identified two additional recordings, 1D052 and 1D503, that they believe were made from a stationary device.  *See* Dkt. 136 at 20 n.13.  1D503 is a duplicate recording of 1D447, which was identified to defendants as a stationary recording on September 3, 2015, along with the rest of the stationary recordings.  The government believes that 1D052 is a stationary recording from January 14, 2010 that was mislabeled internally as a consensual recording.  Defendants also identified a May 8, 2010 FBI surveillance report that indicates three recording devices were used on February 12, 2010.  *See id.*; Def. Ex. 36.  The government believes the May 8, 2010 surveillance report contains a typographical error and the report corresponds to stationary recordings from February 16, 2010 (these February 16 recordings were previously disclosed and identified).

6

The stationary recording devices were designed to capture conversations occurring within the crowds of the public auction, but that could not be captured on the recording devices worn by the cooperator and the undercover agent. *See* Tr. 145:14-22, Feb. 11, 2016. The conversations the FBI hoped to capture using the stationary devices were separate from the cooperating source and the undercover agent posing as his partner, but occurred around "plenty of other people." *Id.* at 157:4-10. Thus, while the source was not invited to join every conversation among Giraudo's group, often many other people at the auction, including strangers, competitors, and auctioneers, remained in close proximity to the defendants during their conversations. *See id.* at 163:25.

The stationary recording devices were the same types of devices used for consensual monitoring in this case and others. *Id.* at 218:12-18. Because the devices were often used for consensual monitoring, they were designed to capture only sounds that a human ear could hear from the same location as the device. *Id.* at 214:8-25. The microphones used in the devices were commercially available and slightly less effective than a normal human ear. *Id.* at 200:19-25, 201:21-24. In practice, the microphones were inferior to human hearing and could not record all of the sounds that a human ear could typically hear. *Id.* at 215:12-22. Because of the technological limitations of the devices, Special Agent Wynar did not, and could not, use the stationary devices to record sounds out of earshot from the location of the device. *Id.* at 218:5:18. As Agent Wynar testified, the microphones used did not create "some kind of bionic ear that . . . [can] hear across the football field." *Id.* at 223:17-22. After the recordings were made, the FBI did not undertake any efforts to improve their audibility. *Id.* at at 218:19-22; *see also* Tr. 11:18-12:3, Feb. 29, 2016.[3]

/ /

/ /

---

[3]    The defendants' failure to inspect the stationary devices or offer expert testimony concerning the capabilities of the devices does not render Agent Wynar's testimony concerning their technological limitations any less credible. Defendants did not file a motion seeking to inspect the devices. And regardless, as the Court noted at the hearing, "[w]hy do I need any expertise in terms of the microphone? . . . [I]t was basically similar to a human ear . . . . And it wasn't enhanced in any way . . . ." Tr. 223:6-13, Feb. 11, 2016.

**D.     The Stationary Recordings Do Not Yield Much of Evidentiary Value and Are Not Used to Further the Investigation.**

The stationary recordings were one component of a large investigation that gathered evidence through a variety of techniques. Tr. 65:1-24, Feb. 11, 2016. The stationary recordings themselves did not yield much of evidentiary value. *Id.* at 107:3-5. Special Agent Wynar said he listened to most of the recordings, but he did not listen to the entirety of every recording. *See id.* at 39:4, 106:24-107:5. Rather, he scanned through irrelevant material and attempted to listen to only relevant portions. *Id.* at 107:3-5. Because of the poor quality of the recordings, it was difficult to hear any of the people captured on the recordings. *Id.* at 172:2-4. Agent Wynar testified that the stationary recordings were "generally ineffective." Tr. 109:5, Feb. 29, 2016. He testified that "these recordings turned out not to be of significant relative value." *Id.* at 116:20-117:4.

In total, Special Agent Wynar could only recall three conversations that he considered indicative of bid rigging. *Id.* at 64:13-19.[4] On one occasion, Special Agent Wynar used evidence from the stationary recordings to discuss with Antitrust Division attorneys the possibility of obtaining a Title III warrant to intercept Mohammed Rezaian's cell phone. Tr. 74:18-24, 77:4-8, Feb. 11, 2016. However, Antitrust Division attorneys did not pursue a Title III and Rezaian's telephone conversations were never recorded. *Id.* at 77:7-10.

In January 2011, when the FBI obtained search warrants to search the premises or vehicles of various subjects, including some of the defendants, none of the search warrant affidavits cited or relied on the content of the stationary recordings. Wynar Decl. ¶14, Dec. 14,

---

[4]     Defendants state that Agent Wynar listened to stationary recordings he believed to be "gold." Dkt. 136 at 20. In the recording cited by defendants, Agent Wynar videotapes the auction area from across the street and speculates out loud, "This is when I get my gold on the tape." Def. Ex. 56. But Agent Wynar had no knowledge of the substance of the conversation while filming (and narrating) from across the street, and defendants do not cite a stationary recording that allegedly captured this "gold." Similarly, defendants refer to text messages in which Agent Wynar states that Appenrodt "laid down GOLD on tape so far." Def. Ex. 3 (05/15/10 08:49:20 (GMT-8)). But when Agent Wynar was questioned about this text he couldn't remember whether that statement referred to a stationary recording or a recording captured on a device worn by a cooperator. Tr. 106:8-15, Feb. 29, 2016 ("[W]ell, it could have been a consensual monitoring tape too, though. It's hard for me to tell.").

2015.  Since that time, 20 individuals have pleaded guilty to bid rigging and fraud for their conduct at real estate auctions in San Francisco and San Mateo counties.  Tr. 232:5-10, Feb. 29, 2016.  None of the stationary recordings were shown to any of the pleading defendants prior to their guilty pleas.  *Id.* at 240:21-241:3.

In 2014, the cooperator was played a portion of a stationary recording during a debrief interview.  *See id.* at 238:10-21; Def. Ex. 63.  In 2015, after the defendants were indicted, two pleading defendants, Mohammed Rezaian and Daniel Rosenbledt, were each played one stationary recording during their debrief interviews.  *Id.* at 240:6-241:3; Def. Exs. 11, 16.  However, these stationary recordings were not used during the interviews of Rezaian and Rosenbledt until after they had already pleaded guilty and been interviewed multiple times.  *See id.* at 240:21-241:3.  Additionally, Rezaian and Rosenbledt were only shown portions of stationary recordings in which they had been present or a participant to the recorded conversation.  Def. Exs. 11, 16, 63, and 64.

## ARGUMENT

## I.    A Person Does Not Have Presumption of Privacy in Public Space.

Defendants seek to suppress every stationary recording based on an allegedly flawed legal justification for recording the public auctions with stationary devices.  Dkt. 136 at 1.  By challenging the process and legal justification – rather than specific recordings – defendants hope to avoid the factual context of particular conversations and the limitations of the recording devices.  The reality is that the conversations at the auctions were often loud and occurred in close proximity to others, and the capabilities of the recording devices were limited and did not capture truly private conversations.  However, by untying their motion from the actual content and context of the recordings, the defendants seek a blanket ruling that would, in effect, create a new requirement to obtain a Title III warrant in order to make any public-place recording – no matter how public the setting, or open the conversation.  This would stand in contrast to long-standing Fourth Amendment precedent and the language of Title III.

Recording conversations in a public space is not prohibited under Title III and does not constitute an impermissible search under the Fourth Amendment unless an individual establishes

9

1   that they had a subjective expectation that the recorded conversation would be private, and that

2   their expectation of privacy was one society is prepared to recognize as reasonable.  *See Katz*,

3   389 U.S. at 361 (Harlan, J. concurring); *see also United States v. Salemme*, 91 F. Supp. 2d 141,

4   172 (D. Mass. 1999), *rev'd in part on other grounds* (indicating the analysis to determine

5   whether a recorded "oral communication" is protected under Title III is the same as the analysis

6   under the Fourth Amendment).

7           As defendants acknowledge, determining whether an individual has a reasonable

8   expectation of privacy is a highly fact-specific inquiry.  *See* Dkt. 136 at 21; *see also O'Connor v.*

9   *Ortega*, 480 U.S. 709, 715-16 (1987).  Evaluating an individual's expectation of privacy requires

10  courts to consider the volume of the conversation; the proximity or potential of other individuals

11  to overhear the conversation; the potential for the communication to be reported; the affirmative

12  steps taken by the speakers to shield their privacy; the need for technological enhancements to

13  hear the communications; and the place or location of the oral communication.  *Kee*, 247 F.3d at

14  213-15.

15          The defendants bear the burden to establish through this fact-intensive inquiry that their

16  reasonable expectation of privacy was violated.  *See Rakas v. Illinois*, 439 U.S. 128, 130 n.1,

17  133-34 (1978) ("the proponent of a motion to suppress has the burden of establishing that his

18  own Fourth Amendment rights were violated").  At a minimum, this fact-intensive inquiry

19  requires the defendants to show that they were "a participant in an intercepted conversation" or

20  the "conversation occurred on [their] premises."  *See United States v. King*, 478 F.2d 494, 506

21  (9th Cir. 1973).  And the burden to establish privacy is substantial when the allegedly private

22  conversations occurred outside, in a publicly accessible and crowded area.  *See Kee*, 247 F.3d at

23  213-15, 217 n.21 (noting that conversations conducted in an open area and in close proximity to

24  others are unlikely to be private).

25          Therefore, while it is possible to have a private conversation in a public place,

26  maintaining such privacy requires considerable vigilance from the speaker, especially when the

27  public place is an open and crowded auction.  *See United States v. Jackson*, 588 F.2d 1046, 1052

28  / /

10

1    (5th Cir. 1979) (conversations are not private when they are "exposed to the 'plain view' of

2    others").

3         Indeed, as the Court recognized at the hearing, conversations at the public auctions are

4    not entitled to "a presumption of privacy."  Tr. 22:17-23, Apr. 5, 2016.

5    **II.    Defendants Improperly Seek Blanket Suppression of Every Stationary Recording**
         **Without Conducting a Fact-Specific Analysis.**
6

7         Despite the fact-intensive inquiry required to determine whether the defendants took

8    sufficient steps to keep a particular conversation private, the defendants seek blanket suppression

9    of every recording, regardless of the context of each conversation.  *See generally* Defs.' Post-

10   Hr'g Brief, Dkt. 136.  Rather than undertake the fact-intensive inquiry, defendants assert that the

11   "probability" that private conversations could have been captured by the FBI's surveillance

12   renders every stationary recording violative of their Fourth Amendment rights.  *Id.* at 22.

13        Likewise, instead of analyzing the facts surrounding each recording, defendants seek

14   suppression of every recording based on an allegedly flawed legal justification for the

15   surveillance provided by Agent Wynar during the suppression hearing.  *See id.* at 1; Tr. 134:15-

16   17, Feb. 11, 2016.  But the legal justification for the surveillance, like an officer's state of mind

17   and subjective understanding of his authority, is not relevant to determining whether there is a

18   Fourth Amendment violation.  *See Brigham City, Utah v. Stuart*, 547 U.S. 398, 404 (2006); *see*

19   *also Wren v. United States*, 517 U.S. 806, 813 (1996).  The only relevant inquiry is whether the

20   stationary recordings actually captured private conversations.

21        And as defendants acknowledge, having a private conversation outside and in public is

22   difficult.  Dkt. 136 at 1.  Therefore, while a private conversation in a public area is possible, for

23   any recording they are seeking to suppress, defendants bear the burden to establish that they took

24   the significant steps necessary to preserve their privacy.  *See Kee*, 247 F.3d at 216.  Asserting

25   that the government's surveillance created a "probability" that private conversations were

26   intercepted is not sufficient.  Defendants have not established, through the required fact-intensive

27   analysis, that they had a reasonable expectation of privacy on each recording they are seeking to

28   suppress.

                                            11

1

2

**III.    Defendants Cannot Establish They Had a Reasonable Expectation of Privacy for Conversations of Which They Were Not Part.**

3          Defendants seek to suppress every minute of every recording without regard to whether

4   they were captured on the recording.  But Fourth Amendment rights are personal rights that

5   "may not be vicariously asserted."  *Rakas,* 439 U.S. at 133-34.  Under Title III, only an

6   "aggrieved person" may move to suppress the contents of an oral communication.  18 U.S.C. §

7   2518(10)(a).[5]

8          And regardless of whether defendants have standing to challenge a particular recording,

9   they must establish a substantive Fourth Amendment or Title III violation in order to have that

10  recording suppressed.  In order to prevail on their motion to suppress, the defendants must

11  establish that their "privacy was actually invaded."  *King*, 478 F.2d at 506.  At minimum, this

12  requires showing that they were "a participant in an intercepted conversation" or the

13  "conversation occurred on [their] premises."  *Id.*  Accordingly, defendants cannot establish their

14  privacy rights were violated if they were not a participant in the conversation captured on the

15  recording.

16         A target of surveillance is not relieved from the requirement that they establish that their

17  privacy rights were violated in a particular recorded conversation.  *See, e.g., United States v.*

18  *Azano Matsura*, 129 F. Supp.3d 975, 979-80 (S.D. Cal. 2015).  Therefore, regardless of whether

19  the defendants were targets of the surveillance, or whether they have standing to challenge the

20

21  _____

[5]          Courts have split on whether listing a defendant as a target is sufficient to confer standing
22  to that defendant to challenge the surveillance.  *See United States v. Glover*, No. 07-015204, 06
    (ESH), 2016 WL 1273171, at *9 (D.D.C. Mar. 31, 2016).  At the hearing the Court concluded
23  that defendants Giraudo, Grinsell, and Cullinane had standing to challenge the stationary
    recordings pursuant to *United States v. Oliva,*705 F.3d 390 (9th Cir. 2012).  Tr. 15:19-23, Feb.
24  11, 2016.  Respectfully, the government disagrees with this interpretation of the reach of *Oliva*.
    The court granted the defendant standing in *Oliva*, who was named as a target on the wiretap
25  order, because he was using the cell phone at issue.  705 F.3d at 395.  The defendant's
    possessory interest in the wiretapped phone was sufficient to confer standing.  Here, the
26  defendants do not have a similar possessory interest in the auction area.  But regardless, even if
    defendants have standing to challenge each and every recording, in order to suppress a particular
27  recording, they must establish that their own privacy rights were violated.  *See Rakas*, 439 U.S.
    at 133-34.
28

U.S. OPP'N TO DEFS.' MOT. TO SUPPRESS
CR 14-00534 CRB

surveillance under the Fourth Amendment or Title III, defendants must establish that their personal privacy rights were violated.  *See Rakas,* 439 U.S. at 133-34.  The principle prohibiting the vicarious assertion of Fourth Amendment rights is particularly important in the context of this case, where defendants' expectation of privacy is analyzed through a fact-intensive analysis. *See supra* Part I.

Yet much of the focus in defendants' motion is not on the conversations in which defendants were actually captured,[6] but instead on recordings that purportedly violate the Fourth Amendment rights of pleading coconspirators and unidentified third parties.  And while the stationary recordings did capture conversations of coconspirators and unknown third parties, defendants did not establish that those recordings violated the expectations of privacy of those individuals.[7]  *See* Tr. 45:8-10, Apr. 5, 2016 (THE COURT: "[Grinsell] doesn't know what's in somebody's mind.  We'll all agree with that."); *see also* Tr. 131:7-17, Feb. 11, 2016.  Here, the defendants undoubtedly undertook significant efforts to sift through the recordings in search of irrelevant third-party conversations.  But after a three-day hearing, defendants have failed to identify the particular recordings in which they actually are captured while engaged in conversations they believed to be private.

The government acknowledges that the defendants are captured on *some* of the stationary recordings.  More than a year ago, through a voluntary disclosure, the government identified 19 stationary recording files made on 12 days, portions of which may contain recorded conversations of the defendants.  *See* Def. Ex. 15.  The defendants bear the burden to establish they had a reasonable expectation of privacy in every conversation they seek to suppress.  At minimum, establishing such an expectation of privacy requires the defendants to show they were a participant in the captured conversation.

---

[6]     As discussed *infra*, defendants cite only three clips in which they were captured, 1D034, 1D098, and 1D045.

[7]     For example, the defendants introduced a conversation between two women on a public sidewalk near the auction area that was captured by the stationary devices.  Defendants have no expectation of privacy for this conversation, of which they were not involved.

The government provided the defendants with the audio-video recordings in this case, including all of the stationary recordings, in December 2014.  Yet apart from the 19 recordings identified by the government, defendants have not established that they were captured on the remaining 44 stationary recordings.  And while identifying that they were a participant on a particular recording is necessary to establish a Fourth Amendment violation, as discussed *infra*, it is not sufficient.

**IV.    Defendants Cannot Establish They Had a Reasonable Expectation of Privacy for Conversations in Which They Spoke Loudly or in Close Proximity to Others.**

Not only does defendants' blanket motion seek to suppress conversations that the defendants were not a part of, but by seeking to suppress every minute of every recording, the defendants also seek to suppress conversations in which they spoke loudly or in close proximity to others.

There is no reasonable expectation of privacy in a conversation that can be overheard by others.  *Jackson*, 588 F.2d at 1052.  Moreover, even conversations that are not overheard by a bystander are not private if they have the potential to be overheard.  *See Kee,* 247 F.3d at 214; *see also In re John Doe Trader Number One*, 894 F.2d 240, 243 (7th Cir. 1990).

Here, the foreclosure auctions were regularly attended by approximately 15 to 30 people.  Special Agent Wynar, who regularly observed the auctions, testified that there "were a lot of people stuffed into that little area."  Tr. 163:23-25, Feb. 11, 2016.  Defendant Grinsell admitted that anyone could attend the auction, and people he did not know attended.  Tr. 42:11-15, Apr. 5, 2016.

Additionally, the auction area was heavily trafficked during the trustee sales.  Special Agent Wynar testified that many people walked by the auction area.  Tr. 159:14-17, Feb. 29, 2016.  Defendant Grinsell indicated that courthouse employees "would pass by the outside of the auction" while entering the courthouse.  Tr. 30:19-22, Apr. 5, 2016.  And defense counsel speculated at the hearing that more than 8,000 people may have walked by the auction area while the stationary recordings were activated.  Tr. 156:22-25, Feb. 29, 2016.

/ /

1    At the auction, most conversations were conducted in close proximity to other people.

2    Defendant Grinsell testified that during the auction when he was bidding, he stood within two-to-

3    three feet from the auctioneer, and that he also had conversations with others while bidding on

4    properties. Tr. 37:2-15, 41:8-22, Apr. 5, 2016.  Grinsell indicated that sometimes to be heard at

5    the auctions, he had to speak loudly. *Id.* at 41:23-25.  Special Agent Byrne, who attended the

6    auctions on occasion, testified that he could walk up to certain people and listen in.  Tr. 204:22-

7    205:4, Feb. 29, 2016.  Special Agent Byrne did not recall an instance where the defendants

8    stopped talking or moved to another location when he approached their conversation. *Id.* at

9    204:22-205:4, 208:25-209:1.

10    The auction area itself was anything but private.  Defendant Grinsell indicated that the

11    auctions occurred in an outdoor "open area" adjacent to a sidewalk and lacking any enclosure,

12    and that "bidders and other people at the auction were free to move around the auction area."  Tr.

13    29:21-22, 30:10, 52:3-5, Apr. 5, 2016.  Grinsell stated that there was an floor-to-ceiling concrete

14    pillar "particularly close to the auction" and further admitted the possibility that the pillar could

15    obscure an individual unknown to the conspirators. *Id.* at 53:1-4.

16    Thus, the auction area, as described by Special Agents Wynar and Byrne, as well as

17    defendant Grinsell, was not conducive to private conversations.  And it was in this setting that

18    the defendants engaged in incriminatory conversations.  Grinsell was questioned about a

19    consensual recording in which he engaged in a conversation with the cooperating source, the

20    undercover agent, and a coconspirator. *See id.* at 61:6-24; *see also* Gov't Ex. 44 (1D145.001 at

21    24:47).  Grinsell identified four people within three to ten feet of the conversation who were not

22    parties to the conversation.  Tr. 58:23-59:1, Apr. 5, 2016; Gov't Ex. 43 (NDRE-SM100412-G-

23    DSC-0128).  And all four people appear closer to Grinsell's conversation than the location of the

24    nearest stationary microphone. *See* Gov't Ex. 46 (1D158-A at 32:23).  If this type of

25    conversation were recorded by a stationary device, bystanders in closer proximity would have

26    been able to hear it.

27    Thus, while the other defendants were not cross-examined, the Court noted at the

28    conclusion of the April 5 evidentiary hearing, the "[defendants] were having incriminatory

15

conversations in proximity to people who were members of the public at the time they had a conversation . . . ." Tr. 89:3-10, Apr. 5, 2016.  And while the photographs and videos of the auction do not establish the exact proximity that bystanders stood in relation to the defendants, Grinsell indicated that other people were within three to ten feet of him while he engaged in an incriminatory conversation.  *See id.* at 58:23-59:1; *see also* Gov't Ex. 43 (NDRE-SM100412-G-DSC-0128).  These incriminatory conversations had the potential to be overheard – by passing members of the public, by courthouse employees going to work, and by the numerous other people who were also standing at the auction site.  Notwithstanding the defendants' incomplete attempts to conceal their conversations, the constant possibility that they could be overheard defeated any reasonable expectation of privacy in their conversations.

## V.  Defendants Have Not Shown They Were Recorded by a Stationary Device When They Took Sufficient Steps to Maintain Their Privacy.

In order to establish that a particular stationary recording violated the defendants' reasonable expectation of privacy, defendants must establish that their private conversation was actually recorded, despite taking significant affirmative steps to maintain their privacy.  Because defendants have not identified any recordings showing they were recorded while taking such affirmative steps, they have not met their burden.

Although defendants seek to suppress every minute of every stationary recording, in their moving papers they cite to a total of 13 stationary recordings.  *See* Dkt. 58, Dkt. 68, and Dkt. 136, *citing* 1D034, 1D041, 1D043, 1D044, 1D045, 1D070, 1D085, 1D098, 1D143, 1D230, 1D453, 1D564 and 1D566.

However, in ten of the 13 recordings, 1D070, 1D041, 1D043, 1D044, 1D143, 1D564, 1D566, 1D085, 1D230, and 1D453, the portions cited by defendants do not involve conversations in which the defendants participated.  Instead, the conversations cited by defendants involve coconspirators or third parties not relevant to this case.  Defendants did not, and cannot, establish that they had an expectation of privacy pertaining to those conversations.

The defendants themselves only appear on three clips they cite, 1D034, 1D098, and 1D045.  But defendants do not establish that those recordings violated their expectation of

16

privacy.  In those recordings, either the defendant failed to take sufficient steps to maintain his privacy, or his words are not captured by the stationary recording device.

1D034 is a recording from the January 4, 2010 auction.  The recording cited by the defendants shows defendant Cullinane and another individual stepping outside of the large crowd at the auction, but still in close proximity to the auction participants.  Def. Ex. 52 (1D034.006 at 8:30).  The same recording later shows Cullinane, Giraudo, and Rezaian speaking together in a circle amid the larger crowd, but remaining in close proximity to an unidentified woman.  *Id.* (1D034.007 at 13:25).  Similarly, the recording later shows Cullinane, Giraudo and Rezaian stepping away from the auction, but remaining in close proximity to the large crowd.  *Id.* (1D034.007 at 16:00).  Multiple people walk by within feet of their conversation.  *Id.* (1D034.007 at 16:25 and 16:32).  Throughout their conversation, an unidentified man talks on his cell phone near the group.  *Id.* (1D034.007 at 16:58).  More than a dozen people are present at the auction.  *Id.* (1D034.007 at 5:15).

Notably, however, neither defendants Cullinane, Grinsell, nor Giraudo have indicated their voices are heard on the recording.  And apart from the auctioneer's calling of the auction, none of the specific conversations cited by defendants are audible on the recording.  To the extent the defendants' conversations were not picked up by the stationary recording device, their efforts to maintain their privacy were successful.  To the extent their voices were captured, they were speaking loudly enough to be heard by the many bystanders often located closer to the defendants than the stationary recording device.

1D098 is a recording from the February 17, 2010 auction.  On this recording, Cullinane and Rosenbledt can be heard having a discussion in a normal volume in the auction area. Def. Ex. 13 (1D098.002_part3 at 0:01).  Although this recording is not accompanied by video surveillance, and the proximity of others cannot be determined, the volume of Cullinane and Rosenbledt's conversation is not indicative of an expectation of privacy.  Moreover, defendants have not presented any evidence that they took affirmative steps to keep this conversation private.

/ /

17

1D045 shows Giraudo speaking on his cell phone next to a pillar in the auction area.  Tr. 67:14-17, Feb. 29, 2016; Dkt. 58, Ex. F (1D045.002 at 2:15).  Notably, while Giraudo talks on the phone, another individual, who later became a cooperator in the investigation stood on the other side of the same pillar between three-and-a-half to four feet away.  Tr. at 67:18-68:5, Feb. 29, 2016; Dkt. 58, Ex. F (1D045.002 at 2:45).  Another unidentified man stood within eight to ten feet of Giraudo and multiple people walked by while he spoke on the phone.  Tr. at 68:6-18, Feb. 29, 2016.  It defies logic to argue that a person would and should believe that a conversation held three feet away from another person is one that person reasonably expects to be private.

Regardless, the portion of 1D045 cited by defendants is irrelevant because Giraudo's voice is inaudible.  After listening to the audio portion of the recording, Agent Wynar testified that he could not understand any conversations on the clip.  *Id.* at 70:2-8.

The remaining ten clips identified by defendants do not involve the defendants.  They either pertain to irrelevant third parties, *see* 1D041, 1D043, 1D044, and 1D070, or they pertain to Rosenbledt, a pleading coconspirator, *see* 1D564, 1D566, 1D034, 1D085, 1D230, and 1D453.  Defendants have not presented evidence concerning the expectation of privacy of the unidentified parties or Rosenbledt; nor would such evidence be relevant to the defendants' motion to suppress.

Moreover, the defendants' citation to these recordings is misleading.  In their motion, they attach as exhibits still frames of the recordings, in which Rosenbledt appears relatively isolated at the auction site.  *See* Dkt. 58, Exs. I, J, K, L, and M.  But as demonstrated by the government during the evidentiary hearing, the actual videos reveal nearby individuals who were not visible in the still frames, and show a typically crowded auction area.  *See* Tr. 46:5-11, Feb. 29, 2016.  For example, in 1D034, while Rosenbledt appears to be speaking on his cellular phone, an auctioneer approaches, stands beside Rosenbledt, and then sits on a bench two to three feet from Rosenbledt.  *Id.* at 48:23-49:2, 49:22-50:1; Dkt. 58, Ex. J.  Rosenbledt does not end his conversation or move away from the auctioneer and continues his conversation in the presence of more than ten people.  Tr. 50:2-14, Feb. 29, 2016.  After listening to the recording, Agent Wynar

/ /

18

1    testified that he could hear Rosenbledt's voice among four others, but could not discern a single

2    word Rosenbledt said.  *Id.* at 53:1-16.

3            Similarly, another still image cited by defendants from 1D230 shows Rosenbledt

4    speaking with an unidentified woman.  *Id.* at 57:7-8, Dkt. 58, Ex. L.  But the actual video

5    recording shows that multiple people, obscured by a pillar, are standing within feet of

6    Rosenbledt.  Tr. 59:11-13, 60:15-23, Feb. 29, 2016.  After listening to the audio recording, Agent

7    Wynar testified that Rosenbledt was speaking in a normal tone of voice among a number of

8    people talking.  *Id.* at 62:1-9.[8]  Accordingly, none of the actual recordings cited by defendants

9    provide a basis for suppression.

10           Instead of relying on the recordings, defendants rely on observations made during

11   surveillance that purport to show defendants' efforts to maintain their privacy at the auction.  For

12   example, defendants cite an FBI surveillance report that indicates that on January 4, 2010, at

13   approximately 1:59 p.m., Cullinane whispered to Rosenbledt at the auction.  Def. Ex 28 (NDRE-

14   FBI-FISUR-000063-65); *see also* Def. Ex 29 (NDRE-FBI-FISUR-000066-67) (stating that on

15   January 11, 2010, Giraudo, Cullinane, Rezaian and Jaime Gonzales walked far from the auction

16   area to talk).  But defendants do not cite to stationary recordings that allegedly capture the

_____

17

18   [8]      The other recordings cited by defendants in their initial brief likewise fail to establish that
     any of the individuals captured on the recordings had a reasonable expectation of privacy.  At the
19   hearing, the government did not elicit testimony on all of the recordings that were cited by the
     defendants because the Court noted that the clips seemed repetitive – it is "hard, if not
20   impossible, to discern the actual words used," and that they generally showed "there were people
     in and out, 2 feet away, 2 ½ feet away, 3 feet away and so forth."  Tr. 73:13-17, 75:2-4, Feb. 29,
21   2016.  Indeed, the remaining recordings cited by defendants, when viewed in proper context as
     opposed to a still frame, all show the crowded nature of the auction.  Photographs taken at the
22   same time as the portion of the recording cited by defendants in 1D564 show Rosenbledt talking
     among more than a dozen people.  *See* Gov't Ex. 78 (NDRE-SM100915-W-DSC-0113 and
23   NDRE-SM100915-W-DSC-0137).  The video portion of 1D566, also cited by defendants as a
     still frame, shows at least four other people near Rosenbledt while he speaks with an unidentified
24   woman.  *See* Dkt. 58, Ex. I; *see also* Def. Ex. 53 (1D566.001 at 19:55-20:15).  Similarly, the
     video portion of 1D453, cited by defendants as a still frame, shows multiple people having a
25   conversation in proximity to Rosenbledt while he speaks to Rezaian.  *See* Dkt. 58, Ex. M; *see
     also* Def. Ex. 53 (1D453.001 at 13:49-14:30).  The video portion of 1D085 shows Rosenbledt
26   speaking into a Bluetooth device, while a man, obscured by the pillar for much of the video, sits
     within feet of Rosenbledt.  *See* Dkt. 58, Ex. K; *see also* Gov't Ex. 15 (1D085.001 3:07-4:08).

27

28

                                                     19

conversations referred to in these reports.  And because of the limitations of the recording devices, the stationary devices would not capture whispered conversations.  Tr. 162:19-24, Feb. 11, 2016.  In fact, Agent Wynar confirmed that after reviewing the portion of the January 4, 2010 recording cited by defendants, he could not discern any whispered conversations.  Tr. 27:24-28:5, Feb. 29, 2016.

Therefore, while the reports demonstrate that defendants occasionally took steps to maintain their privacy at the auction, they fail to demonstrate that the defendants' conversations were actually recorded when they took these steps.  So while the defendants may have whispered at the auction, they have not cited any whispered conversations that were captured by the stationary devices.  *See* Tr. 162:19-24, Feb. 11, 2016; *see also* Tr. 28:3-5, Feb. 29, 2016.  And while the defendants may have occasionally left the auction area to engage in a private conversation, the stationary recording devices did not capture conversations occurring outside of the auction area.  Tr. 29:10-13, Feb. 29, 2016.  Moreover, the fact that defendants occasionally took steps to maintain their privacy cannot provide a basis to suppress every recording.

## VI.    Defendants' Declarations Do Not Establish They Had a Subjective Expectation of Privacy, and Defendant Farag's Declaration Was Stricken.

As noted above, in order for this Court to find that a specific recording violated a defendant's reasonable expectation of privacy, a defendant must show a subjective expectation of privacy in that recording – that is, that he personally believed that the conversation that is the focus of the suppression motion was a private one.

To meet this requirement, defendants submitted five identical boilerplate declarations.  Def. Exs. 66-69.  At a third day of the evidentiary hearing on the motion, the Court admitted four of the declarations.  Tr. 88:24-89:10, Apr. 5, 2016.  Defendant Farag refused to appear to defend his declaration, and it was not admitted.  *Id.* at 89:17-20.

Just as defendants have done throughout their motion, they seek to use sweeping, non-specific generalizations about the foreclosure auctions to establish that they had a reasonable expectation of privacy in every minute of every conversation picked up by the stationary recordings.  This is legally insufficient.

1  Defendants do not state in their declarations – because they cannot – that they reasonably

2  believed that all of their conversations at these crowded and public auctions were private.

3  Rather, they state that they "frequently" engaged in what they believed were private

4  conversations.  *See, e.g.*, Def. Ex. 67, Decl. of Raymond Grinsell ¶6.  But they do not specify

5  which conversations they expected to be private, and they do not cite to a single stationary

6  recording in which they claim that they had a private conversation.  Nor do they explain what

7  steps they took to maintain privacy in any specific conversation or cite to any of the specific

8  facts and circumstances surrounding any conversation that would have led the defendants to

9  conclude that those conversations were private.  The vast majority of the recorded conversations

10  took place amid a crowd of people gathered in close proximity to one another for a public outcry

11  auction.  *See, e.g.*, Gov't Ex. 2; Tr. 192:5-16, Feb. 11, 2016.

12  Likewise, the defendants' declarations each contain a boilerplate explanation of steps that

13  the defendants took to shield their privacy.  *See* Def. Ex. 69, Decl. of James L. Appenrodt ¶7 ("In

14  order to maintain confidentiality and privacy, I routinely would walk away from a larger group,

15  stand close to the individuals with whom I was speaking, cease conversations when others

16  approached, try to speak out of earshot of other people, or speak quietly or whisper.").  But

17  defendants do not specify which steps they took during any specific recordings.

18  If anything, these declarations show that general conversations at these auctions were not

19  private; otherwise they would not have needed to take additional steps to maintain their privacy.

20  Put simply, if general conversations in the crowded auctions were private, there would be no

21  need for the defendants to walk away or cease conversation or speak out of earshot of others.

22  Therefore, defendants' declarations show that they understood the crowds at the auction had the

23  potential to overhear their conversations.  *See Kee*, 247 F.3d at 216 (the potential of being

24  overheard "would eviscerate a [person's] subjective expectation of privacy").

25  Defendant Grinsell testified to as much, stating that at times when talking to others at the

26  auction he would "whisper in their ear or talk very quietly or close to them."  Tr. 54:3-4, Apr. 5,

27  2016.  He testified that "it was pretty easy to talk to somebody if you were talking pretty much

28  directly into their ear where other people could not hear you."  *Id*. at 51:13-14.  But in their

21

motion, defendants cite to no stationary recording in which they claim that the defendants took any of these steps and their voices were nonetheless captured.  To the contrary, evidence from the hearings shows the recording devices were not sensitive enough to pick up whispers or conversations when individuals walked away from the auction site or were speaking quietly standing next to others.  Tr. 214:8-25, 215:6-19, Feb. 11, 2016.

Each defendant must show, in order to establish that his personal privacy rights were violated, that he had a subjective expectation of privacy in any conversations he seeks to suppress.  Defendant Farag was given the opportunity to submit a declaration asserting this subjective expectation, but his declaration was properly stricken from the record because he chose not to attend the hearing.  Tr. 89:17-20, Apr. 5, 2016.  *See United States v. Baskin*, 424 F.3d 1, 4 (1st Cir. 2005) (striking a defendant's declaration submitted at a suppression hearing after the defendant asserted his Fifth Amendment rights and refused to respond to questions regarding that declaration); *see also United States v. Deleston*, No. 15-CR-113 PKC, 2015 WL 4745252 *5 (S.D.N.Y. 2015), *quoting United States v. Polanco,* 37 F. Supp. 2d 262, 264, n.4 (S.D.N.Y. 1999) ("[I]n practice, the self-serving affidavit of the moving defendant is usually disregarded if he declines to testify at the hearing.").

Farag has not identified a single recording in which he is captured.  And he has not presented evidence of his subjective expectation of privacy.  This alone is sufficient to deny the motion as to Farag.

## VII.   The Requirements of Necessity and Minimization Under Title III Are Not Relevant to Defendants' Motion to Suppress.

Defendants contend that the government could not have obtained a Title III order had it applied for one because its other investigative techniques were working at the time the FBI began using the stationary recordings.  Dkt. 136 at 32.  But whether the government hypothetically could have obtained a Title III warrant is irrelevant to the merits of defendants' motion.  The government did not seek a warrant and whether it could have obtained one has no impact on the analysis of whether the defendants had a reasonable expectation of privacy during

/ /

22

particular conversations at the auction.[9]  Similarly, defendants' contention that the government

failed to minimize the interception of communications unrelated to the investigation is not

relevant to defendants' motion to suppress.

**VIII.   Defendants Must Establish a Factual Nexus Between a Specific Allegedly Unlawful Recording and Allegedly Tainted Evidence.**

As the government indicated at the outset of its opposition to defendants' motion to

suppress, the government is not using any of the stationary recordings.  Further, the government

maintains that there is no derivative evidence from the stationary recordings.  Indeed, the record

indicates that the information obtained from the few stationary recordings that had any

evidentiary value had already been discovered through other investigative techniques.  *See* Tr.

207:9-17, 183:5-14, Feb. 11, 2016.

However, were the Court to find any of the recordings to be violative of Title III or the

Fourth Amendment, any inquiry into the existence of derivative evidence must be tied to a

particular recording found to be unlawful under Title III or the Fourth Amendment.  For

example, if the Court found a particular recording to have captured a private conversation in

violation of defendants' rights, that recording – and that recording alone – would be subject to a

taint analysis.  The defendants could not use the remainder of the recordings as a basis to

suppress any evidentiary "fruits" because there cannot be fruits from a lawful recording.

/ /

---

[9]     Additionally, defendants misconstrue the requirements under Title III.  The "mere attainment of some degree of success during law enforcement's use of traditional investigative methods does not alone extinguish the need for a wiretap."  *United States v. Canales Gomez*, 358 F.3d 1221, 1226 (9th Cir. 2004) *quoting United States v. Bennett*, 219 F.3d 1117, 1121 (9th Cir. 2000).  Additionally, when considering whether other investigative techniques have been tried and failed, "the government is entitled to more leeway in its investigative methods when it pursues a conspiracy."  *United States v. McGuire*, 307 F.3d 1192, 1198 (9th Cir. 2002).  Thus, while the government acknowledges that prior to activating the stationary recording devices, it had already developed evidence of fraud and bid rigging, here, Special Agent Wynar testified that the cooperating source had a sour relationship with many of the conspirators and, therefore, although the auction was generally public, the cooperator had difficulty participating in certain conversations among Giraudo's group.  *See* Tr. 56:16-23, Feb. 11, 2016; *see also id.* at 148:18-25.

23

1        There can be no fruits from a recording that did not violate the defendants' reasonable

2   expectation of privacy.  *See United States v. Kandik*, 633 F.2d 1334, 1335 (9th Cir. 1980).  In

3   other words, the defendants must establish a "factual nexus between the illegality and the

4   challenged evidence."  *Id.*

5        By seeking to suppress every minute of every recording, the defendants are seeking to

6   circumvent their burden to establish a nexus between a particular stationary recording and any

7   other evidence.  On day two of the hearing, the defendants indicated that they were prepared to

8   provide the Court with "numerous" recordings that were both audible and used in connection

9   with the investigation.  Tr. 261:10-14, Feb. 29, 2016.  The defendants have not specifically

10  identified these recordings, and the government cannot discern whether these numerous

11  recordings are referred to in the defendants' pleading papers.  The law on taint, however, is clear:

12  there cannot be "fruits" from a stationary recording that was obtained lawfully.

## CONCLUSION

     For the reasons set forth above, the United States respectfully requests that the Court

deny defendants' motion to suppress.

Dated:  June 17, 2016               Respectfully submitted,

                                        */s/ Andrew J. Nicholson-Meade*
                                        David J. Ward
                                        Lidia Maher
                                        Andrew J. Nicholson-Meade
                                        E. Kate Patchen
                                        Antitrust Division
                                        U.S. Department of Justice