LATHAM & WATKINS LLP
 Daniel M. Wall (Bar No. 102580)
  dan.wall@lw.com
 Ashley M. Bauer (Bar No. 231626)
  ashley.bauer@lw.com
 Alicia R. Jovais (Bar No. 296172)
  alicia.jovais@lw.com
505 Montgomery Street, Suite 2000
San Francisco, California 94111-6538
Telephone: +1.415.391.0600
Facsimile: +1.415.395.8095

*Attorneys for Defendant Abraham S. Farag*

*Additional Counsel on Signature Page*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JOSEPH J. GIRAUDO, RAYMOND A. GRINSELL, KEVIN B. CULLINANE, JAMES F. APPENRODT, and ABRAHAM S. FARAG,<br><br>Defendants. | CASE NO. CR 14-00534 CRB<br><br>**DEFENDANTS' REPLY IN SUPPORT OF POST-HEARING BRIEF IN SUPPORT OF MOTION TO SUPPRESS EVIDENCE** |

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANTS' REPLY ISO
POST-HEARING BRIEF
CASE NO. CR 14-00534-CRB

# TABLE OF CONTENTS

**Page**

I.   SUMMARY OF ARGUMENT ................................................................... 1

II.  ARGUMENT ........................................................................................ 2

    A.   The Government Did Not Conduct the Fact-Intensive Analysis It Now Espouses When It Conducted This Electronic Surveillance. ...................... 2

    B.   The Government Intercepted Conversations in Which Defendants Had Subjective and Objectively Reasonable Expectations of Privacy. ................................................................................................. 6

        1.   Defendants' Declarations and Conduct Establish Their Subjective Expectations of Privacy. ............................................ 6

        2.   The Government's Claim Regarding Overhears Is Unsupported by the Record and Wrong on the Law ................................. 8

    C.   The Government Cannot Fault Defendants for Failing to Reconstruct the Factual Circumstances that It Ignored and Failed to Document .................................................................................. 11

    D.   The Government Concedes that the Court Found Defendants Have Standing to Challenge the Recordings Under *Oliva*. ......................... 14

III. CONCLUSION ................................................................................. 15

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANTS' REPLY ISO
POST-HEARING BRIEF
CASE NO. CR 14-00534-CRB

# **TABLE OF AUTHORITIES**

**Page(s)**

## **CASES**

*Bond v. United States*,
   529 U.S. 334 (2000) .................................................................................................7

*Brigham City v. Stuart*,
   547 U.S. 398 (2006) .................................................................................................5

*Dorris v. Absher*,
   179 F.3d 420 (6th Cir. 1999) ...................................................................................7

*Katz v. United States*,
   389 U.S. 347 (1967) .................................................................................................3

*Kee v. City of Rowlett*,
   247 F.3d 206 (5th Cir. 2001) ...............................................................................3, 11

*United States v. Cantu*,
   625 F. Supp. 656 (N.D. Fla. 1985), *aff'd*, 791 F.2d 940 (11th Cir. 1986) .............12

*United States v. Cooper*,
   No. CR 09-00156 SI, 2014 WL 3784344 (N.D. Cal. July 31, 2014) .......................14

*United States v. Glover*,
   No. 07-0152-04, 06 (ESH), 2016 WL 1273171 (D.D.C. Mar. 31, 2016) ................15

*United States v. King*,
   478 F.2d 494 (9th Cir. 1973) ...................................................................................5

*United States v. Losing*,
   539 F.2d 1174 (8th Cir. 1976) .................................................................................12

*United States v. McIntyre*,
   582 F.2d 1221 (9th Cir. 1978) ..............................................................................3, 7

*United States v. Nerber*,
   222 F.3d 597 (9th Cir. 2000) ................................................................................3, 7

*United States v. Oliva*,
   705 F.3d 390 (9th Cir. 2012) ...................................................................................14

*United States v. Ortiz*,
   No. C 12-00119 SI, 2013 WL 6842537 (N.D. Cal. Dec. 27, 2013) ...................14, 15

*United States v. Smith*,
   978 F.2d 171 (5th Cir. 1992) ..............................................................................5, 11

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANTS' REPLY ISO
POST-HEARING BRIEF
CASE NO. CR 14-00534-CRB

*United States v. Turner,*
    528 F.2d 143 (9th Cir. 1975) ............................................................................................5

*United States v. Williams,*
    15 F. Supp. 3d 821 (N.D. Ill. 2014) ...............................................................................3

*Whren v. United States,*
    517 U.S. 806 (1996) ........................................................................................................5

**STATUTES**

18 U.S.C. § 2510(11) ..........................................................................................................14

18 U.S.C. § 2511(1)(a) .........................................................................................................5

18 U.S.C. § 2515 ...................................................................................................................2

DEFENDANTS' REPLY ISO
POST-HEARING BRIEF
CASE NO. CR 14-00534-CRB

# I.    SUMMARY OF ARGUMENT

After months of briefing in which it took a contrary position, the Government finally admits that an individual can have a reasonable expectation of privacy in a public place. It now acknowledges that one cannot generalize about privacy in public because the Fourth Amendment and Title III require a fact-specific analysis of the moment-to-moment circumstances surrounding potentially incriminating conversations. The Government tries to turn that principle against Defendants, however, arguing that Defendants cannot challenge the FBI's extensive, poorly-documented, and unauthorized recordings unless *Defendants* are able to reconstruct the particular circumstances of each of the hundreds of individual conversations.

The Government asks the Court to ignore (a) what the Government did in carrying out the electronic surveillance in this case and (b) the deeply flawed—and now, admittedly incorrect—Fourth Amendment and Title III analysis that led to it. The Government *never* considered the specific facts and circumstances of particular conversations before recording them. It authorized itself to record—without a Title III order—based on *precisely* the kind of generalizations about the lack of privacy in public places that it finally acknowledges are inappropriate. The Government did not selectively record only those conversations that, in their discrete circumstances, did not seem private. Instead, the Government turned on the recording devices and kept them running continuously, for up to five hours, on dozens of occasions, over a period of nine months, recording anyone and anything in range of the hidden microphones. Indeed, the Government now acknowledges that it saw Defendants taking affirmative steps to protect their privacy during the auctions—and yet it still kept recording their conversations, no matter how private their discussions or how unrelated those discussions were to the Government's investigation. The *ex ante* generalization upon which the Government authorized itself to conduct this recording campaign led it to evade the court oversight that would have limited the unlawful intrusions upon citizens' private discussions.

The issue before the Court is not whether, if we turned back the clock, the Government might have been able to record some of these conversations because someone was speaking too loudly, was too close to others, or exhibited some behavior inconsistent with even a subjective

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

expectation of privacy. Such revisionism is not appropriate when applying a statute whose very purpose is to require *advance* judicial authorization of secret electronic eavesdropping. That perspective would reward the Government for the breadth of its illegal behavior and its shoddy recordkeeping. Here, the Government recorded more than *214 hours* of conversations without any judicial authorization or oversight. Having opted out of Title III, the Government did not keep proper records. For many of the dates on which the devices were used, there is *no* record of what was happening nearby, so reconstructing the circumstances is not possible. The only fair way to approach this case is thus on the Government's own terms: it authorized itself to record *en masse*, so the recordings should stand or fall *en masse*. Any other course invites the Government to adopt a "better to beg for forgiveness than to ask for permission" approach to Title III compliance, when the statute itself demands permission.

The core issue is whether the Government violated the Fourth Amendment and Title III when it recorded all conversations in the vicinity of the San Mateo County Courthouse based on the justification that some conversations could have been overheard. It did, and the Court should suppress all of the stationary recordings. *See* 18 U.S.C. § 2515 (providing that "[w]henever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial . . ."). Defendants also respectfully request that the Court schedule a taint hearing, the purpose of which will be to sort out the impact of the Government's illegal conduct on the other evidence in the case. In that hearing, the parties will turn to the question of how specific stationary recordings advanced the investigation and which derivative evidence must be suppressed.

## II.     ARGUMENT

### A.     The Government Did Not Conduct the Fact-Intensive Analysis It Now Espouses When It Conducted This Electronic Surveillance.

In its opposition, the Government concedes for the first time that "it is possible to have a private conversation in a public place[.]" Dkt. 144 at 10; *id.* at 1 ("[P]rivate conversations in a public place are possible[.]"); *id.* at 11 ("[A] private conversation in a public area is possible[.]"). The Government has finally accepted the long-held principle that individuals may have

reasonable expectations of privacy in places accessible to others. *See, e.g.*, *Katz v. United States*, 389 U.S. 347, 351-52 (1967); *United States v. McIntyre*, 582 F.2d 1221, 1224 (9th Cir. 1978). In light of the overwhelming evidence offered at the hearings, the Government also admits that Defendants "took the significant affirmative steps necessary to maintain their privacy." Dkt. 144 at 2; *id.* at 20 (Defendants "occasionally took steps to maintain their privacy").

These are empty concessions, however, because the Government tries—as it has throughout these proceedings—to turn to its advantage the principle that whether a speaker has a reasonable expectation of privacy in a conversation in a public place is a fact-intensive inquiry that depends on a variety of factors such as the volume of the conversation and the proximity of others. *See id.* at 1, 9, 11, 13; *Kee v. City of Rowlett*, 247 F.3d 206, 213-14 (5th Cir. 2001). Without citing a single case involving comparable, long-term electronic surveillance, the Government asserts that "[t]he defendants bear the burden to establish they had a reasonable expectation of privacy in *every conversation* they seek to suppress." Dkt. 144 at 13 (emphasis added). In other words, the Government argues that Defendants must prove both their subjective and objectively reasonable expectation of privacy on a conversation-by-conversation basis for every conversation in the over 214 hours of recordings even though the Government has represented to the Court that it has no intention of using these recordings. *Id.* at 1, 9, 11, 13; Dkt. 62 at 1, 7, 16-18.

Defendants are not aware of, and the Government has not cited, any cases in which courts parse recordings conversation by conversation. And this is not a case of limited, selective recording, where such an analysis might be possible. *Cf. McIntyre*, 582 F.2d at 1223 (evaluating reasonable expectations of privacy in an individual office over a 45-minute period); *United States v. Nerber*, 222 F.3d 597, 603 (9th Cir. 2000) (evaluating reasonable expectations of privacy in a motel room over a three-hour period); *United States v. Williams*, 15 F. Supp. 3d 821, 824-25 (N.D. Ill. 2014) (evaluating reasonable expectations of privacy in a police squadrol during transportation from the scene of the alleged crime to the ATF office). Had the Government conducted its unauthorized electronic surveillance program *selectively*, targeting *isolated* conversations, the focus of the Court's analysis would be commensurately narrow, and

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

3

DEFENDANTS' REPLY ISO
POST-HEARING BRIEF
CASE NO. CR 14-00534-CRB

perhaps it might be possible to analyze specific conversations. In such a case, it is conceivable that the Court could find that the Government recorded some of Defendants' conversations lawfully, even though others were recorded unlawfully. For example, it may have been permissible for the FBI agents to activate the recording devices without judicial authorization for a few minutes, upon reason to believe that the targets had no reasonable expectation of privacy at a particular time.

But that is the opposite of how the Government actually conducted the electronic surveillance in this case. This was not a curated recording campaign. FBI agents activated the stationary recording devices on more than twenty-eight occasions over the course of nine months. Def. Ex. 2; 2/11 Tr. at 47:16-20. They placed the devices in three distinct, covert locations in the vicinity of the courthouse entrance. 2/11 Tr. at 36:3-16. The agents frequently turned on the devices "well before the auction start[ed]" and left them running until "well after the auction . . . ended," sometimes for up to five hours continuously. *Id.* at 109:9-16, 105:11-14; Def. Ex. 2. They made no effort to minimize the interceptions.[1] *See* 2/11 Tr. at 103:21-24, 105:15-18; 2/29 Tr. at 210:12-15, 246:22-247:7. The FBI ultimately amassed more than 214 hours of conversations—nearly as many hours as the consensual recordings, which the Government claims were so fruitful. 2/29 Tr. at 156:11-15; Dkt. 144 at 3.

The FBI agents and Antitrust Division attorneys working on this case never considered whether there could have been a reasonable expectation of privacy on a moment-by-moment or even a "recording-by-recording" basis. 2/11 Tr. at 133:13-23, 97:14-22. Instead, they made a general determination about the auction "zone" and concluded that "just for walking into [this] space" a person lost any reasonable expectation of privacy. *Id.* at 134:6-17, 157:10-12. There is

---

[1] The Government claims that its failure to minimize has no bearing on Defendants' motion. Dkt. 144 at 22-23. The failure to minimize resulted in the incredible scope of this electronic surveillance program and illustrates the importance of judicial oversight to ensure that the Government's intrusion on citizens' privacy rights is no greater than necessary, assuming it is necessary at all.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

4

DEFENDANTS' REPLY ISO
POST-HEARING BRIEF
CASE NO. CR 14-00534-CRB

no doubt about the Government's generalized approach to this recording campaign; Agent Wynar was very matter-of-fact in explaining how the recordings came about.[2]

This is a situation where the Government authorized itself to conduct virtually unlimited surveillance of *all* conversations outside the courthouse just because it thought it was conceivable that *some* conversations could have been overheard, and so there was no reasonable expectation of privacy in the area generally. That sweeping rationale disregards Title III, which requires judicial authorization *prior* to the interception of *any* protected communication. *See* 18 U.S.C. § 2511(1)(a). There is no authority for what the Government did here. Defendants have been unable to find any decision even addressing comparable long-term unauthorized electronic surveillance, and the Government has cited nothing excusing a failure to comply with Title III on remotely analogous facts. The Government's reasoning—that in a place where others are (or later could be) present, all expectations of privacy are necessarily unreasonable—is also wrong. It makes the error noted by the Fifth Circuit in *United States v. Smith*, 978 F.2d 171, 179 (5th Cir. 1992), where the court held that the critical question is not "whether it is *conceivable* that someone could eavesdrop on a conversation but whether it is *reasonable* to expect privacy" (emphases in original). It was absolutely reasonable for citizens gathered outside the San Mateo County Courthouse to expect privacy at least from time to time. There is abundant evidence that Defendants and others had private conversations in this space. Title III authorization was therefore required.

The Government's disregard for the specific circumstances that might prohibit or permit any particular recording warrants suppression of all recordings here. *See United States v. King*, 478 F.2d 494, 505-06 (9th Cir. 1973) (suppressing entire wiretap due to improper authorization); *United States v. Turner*, 528 F.2d 143, 156 (9th Cir. 1975) (observing that "a total suppression

---

[2] Defendants have never argued that this motion turns on Agent Wynar's or the Antitrust Division and FBI attorneys' states of mind or the Government's understanding of the law. *See* Dkt. 144 at 11. Rather, the Government's blanket justification for this electronic surveillance program resulted in the program being carried out unlawfully. The Government's citations to *Brigham City v. Stuart*, 547 U.S. 398 (2006) and *Whren v. United States*, 517 U.S. 806 (1996) are misplaced because in those cases, the defendants claimed that the subjective motivations of the individual law enforcement officers should drive the outcome.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

might well be appropriate" as a remedy for the government's failure to abide by Title III's minimization requirements).  Any other rule would reward the Government for the extraordinary breadth of this electronic surveillance program because Defendants could only challenge the surveillance by arguing facts that the Government never preserved.  It would also invite the Government to do this again, knowing that, with 20/20 hindsight, it could rescue an illegal surveillance operation by pointing to a few instances of conversations made without a reasonable expectation of privacy.  The Government's belated acknowledgement that its blanket justification for the recordings was flawed does not change the fact that the entire recording campaign was carried out in violation of the Fourth Amendment and Title III.

     **B.**    **The Government Intercepted Conversations in Which Defendants Had Subjective and Objectively Reasonable Expectations of Privacy.**

       Despite the extraordinary scope of the Government's surveillance program, Defendants have pointed to specific evidence in the record demonstrating that they had subjective and objectively reasonably expectations that their conversations would remain private.

       **1.**    **Defendants' Declarations and Conduct Establish Their Subjective Expectations of Privacy.**

       The Government argues that Defendants' declarations do not establish their subjective expectations of privacy because Defendants only "frequently" engaged in private conversations.  Dkt. 144 at 21.  According to the Government, Defendants' motion must fail because "at times, [they] did not consider their conversations at the auctions to be private because they understood they had to leave the auction area or whisper to maintain privacy."  *Id.* at 2.  The Government is stating the obvious.  Defendants have never taken the position—in their briefs, declarations, or testimony[3]—that every conversation at the courthouse was private.  However, it is also not the case that every conversation at the courthouse was public, as the Government wrongly assumed when it carried out this surveillance.

---

[3] The Government agreed that the testimony of Defendants Giraudo, Cullinane, and Appenrodt would be the same as Grinsell's.  *See* 4/5 Tr. at 88:24-89:11.

Defendant Grinsell testified that some of his communications, such as bids, were public. 4/5 Tr. at 40:14-16. But other communications "going on while the auctions were being conducted" were private; if a bidder "talked openly about what they were going to bid, the condition of the property or anything else, it would work contrary to their interests in getting the property." *Id.* at 40:17-20, 43:19-44:1. The declarations and testimony are more than sufficient to establish that Defendants actually believed that many of their conversations during the auctions were private. *See McIntyre*, 582 F.2d at 1223 (subjective prong was satisfied where defendant testified that he believed conversations in his office would not be overheard, even when the doors were open); *see* Dkt. 136 at 24-25.

Although the Government makes much of the fact that Defendant Farag did not offer a declaration, Dkt. 144 at 2, the absence of a declaration is immaterial.[4] Aside from a defendant's testimony, courts look to both the defendant's actions and to common sense to assess whether the defendant had a subjective expectation of privacy. *See Bond v. United States*, 529 U.S. 334, 338 (2000) ("[W]e ask whether the individual, *by his conduct*, has exhibited an actual expectation of privacy[.]") (emphasis added); *Nerber*, 222 F.3d at 603 (defendants had a subjective expectation of privacy in a motel room because they "ingested cocaine and brandished weapons in a way they clearly would not have done had they thought outsiders might see them"); *Dorris v. Absher*, 179 F.3d 420, 425 (6th Cir. 1999) ("[T]he frank nature of the employees' conversations makes it obvious that they had a subjective expectation of privacy. After all, no reasonable employee would harshly criticize the boss if the employee thought that the boss was listening.").

Numerous video recordings show Farag—like the other Defendants—taking specific steps to protect his privacy, such as looking around and leaning close to others, *see, e.g.*, Def. Ex. 53 (1D073.007 at 27:40), and stepping away from the crowd, *see, e.g.*, Def. Ex. 53 (1D048.003 at 7:50 & 14:57). More broadly, the testimony is very clear that bidders "did everything possible

---

[4] The Government incorrectly states that Defendants offered five declarations and that Farag's declaration was stricken. *See* Dkt. 144 at 2, 20, 22. Farag's declaration was never offered. The Court ordered Farag to appear at the April 5 hearing if he wanted to introduce his declaration. Dkt. 110. Because Farag was en route to Cuba on a humanitarian mission when the April 1 order issued, he was unable to submit a declaration. *See* Dkt. 106; Dkt. 109. Farag offered alternative dates for his testimony, Dkt. 109, and never "refused to appear," Dkt. 144 at 20.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANTS' REPLY ISO
POST-HEARING BRIEF
CASE NO. CR 14-00534-CRB

to make sure nobody else heard [their] conversation[s]."  4/5 Tr. at 46:14-21.  They frequently stepped away from the auction crowd, stood close to those with whom they were speaking, spoke softly, and ceased conversation when others approached.  Dkt. 136 at 26-28 (summarizing testimony of Grinsell and video recordings from January 4 and April 12).  Bidders knew they needed to protect against overhears because they were surrounded by actual and potential competitors.  *See* 4/5 Tr. at 43:12-44:1.  Indeed, the Government's own agent testified that it was "typical behavior" for Defendants to walk away, 2/11 Tr. at 153:2-11, and "intentionally separate[]" themselves from others when they did not want to be overheard, *id.* at 148:11-25.

## 2. The Government's Claim Regarding Overhears Is Unsupported by the Record and Wrong on the Law.

The Government claims that Defendants had no reasonable expectation of privacy in their conversations because "attendees could overhear conversations occurring" at the auctions.  Dkt. 144 at 5; *id.* at 2 ("[T]he potential to be overheard was ever-present.").  But the record does not contain anything indicating that Defendants' private conversations actually were overheard. Despite an opportunity to do so, the Government failed to offer the testimony of any bystander who overheard any of Defendants' conversations.  Further, the Government's emphasis on the presence of others misconstrues the law.  The question is whether Defendants' expectation of privacy was reasonable, not whether it is conceivable that someone might have overheard their conversations.

The Government relies on Agent Wynar's testimony that "when interviewed by the FBI, [auction participants] confirmed that the bid-rigging and fraudulent conduct occurring at the auctions was open, observable, and obvious."  Dkt. 144 at 6.  This attempts to circumvent the Court's April 5 order requiring the Government to offer live witness testimony to establish that members of the public were able to overhear conversations at the auctions.  *See* Dkt. 118.  The Court was very clear that to rebut the evidence offered by the defense, the Government needed to offer a witness who was not a business partner of Defendants and who overheard Defendants' conversations.  4/5 Tr. at 90:9-11 ("[T]hat's exactly the sort of thing that I think you need.  A member of the public who overheard these conversations.");  *id.* at 75:17-21 ("[B]ring in the

witness who overheard. Bring in that person who said, *I walked by this defendant, this gentleman. I walked by him, and you know what I heard him say? I heard him say 'we're fixing the price'.*"); *id.* at 69:17-19 ("[I]f you have got some evidence out there that a stranger, a member of the public, overheard these conversations, bring it on.").

Despite clear instructions from the Court, the Government "elected not to call additional witnesses." Dkt. 130 at 1. Having failed to offer a witness that the Court deemed necessary to rebut the evidence presented by the defense, the Government cannot be heard to argue that bystanders and passersby could overhear Defendants' conversations. This issue is closed.

The Government also claims that Agent Byrne could overhear conversations at the auctions. Dkt. 144 at 5 ("Special Agent Ronan Byrne, who attended the auctions on multiple days, overheard conversations at the auctions."); *id.* at 15 ("Special Agent Byrne . . . could walk up to certain people and listen in."). In fact, Agent Byrne testified that the very purpose of the stationary devices was to "record conversations *that [he] [himself] [was not] able to hear.*" 2/29 Tr. at 214:1-9 (emphasis added). It was his "hope or expectation" that if he "moved away from the backpack [device], the backpack may ultimately capture conversations that it wouldn't have captured had [Agent Byrne] been standing right there." *Id.* at 214:18-215:2. Further, although Agent Byrne testified that he was able to overhear a conversation between alleged co-conspirator Dan Rosenbledt and Dick Goodell, *id.* at 210:16-211:7, his report from that day states that it was "unclear what [Rosenbledt and Goodell] were discussing," Def. Ex. 22.

The testimony at the hearings establishes that it was "difficult" and "rare" to overhear another person's conversation at the auctions. 4/5 Tr. at 43:12-44:1. "[M]ost people were being very careful about trying to talk in quiet voices about anything that was really significant about the properties that were being auctioned." *Id.* at 43:12-18. The very purpose of this entire recording campaign was to capture those communications the Government could not otherwise overhear. Indeed, the "key observation made in the early part of the case" was that there were many potentially conspiratorial conversations that the FBI, the informant, and the undercover agent would be unable to hear without the stationary recordings. 2/11 Tr. at 155:7-12, 145:9-19.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

The recordings exist only because of the Government's desire to penetrate conversations that informants and agents walking around the auction area could not overhear.

Unable to point to a witness who actually overheard Defendants' conversations, the Government relies heavily on the "close proximity" of bystanders and passersby. Dkt. 144 at 1-2, 7, 9, 14-16, 17-19. The Court was very clear during the April 5 hearing that general statements regarding the proximity of others do not establish that conversations could be overheard. 4/5 Tr. at 73:20-24 (calling for "a technical person who would say, *Standing at this place, at this location, this number of feet from the microphone, this conversation could be overheard*"); *id.* at 75:22-76:5 (calling for an expert who would "say, *This recording taken at this distance could be heard at Y distance, and looking at this photograph, the gentleman in the orange would be within that range that he would have heard the conversation.* That's the kind of evidence you need."); *id.* at 79:11-13 ("And you're asking me to conclude that these people who are walking by heard the conversation. There is no way I can do it without some scientific evidence.").[5]

The Government has failed to rebut the evidence offered by Defendants that they exercised "considerable vigilance," Dkt. 144 at 10, to avoid overhears. *See* Dkt. 136 at 26-28 (summarizing evidence of the affirmative steps Defendants took to protect their privacy). Even in the conversation cited by the Government, "[t]here is no indication at all that [the passersby] hear[d] a single word that was said. No indication." 4/5 Tr. at 79:4-10 (Court discussing Gov't Ex. 45); Dkt. 144 at 15 (citing a conversation involving Grinsell on April 12, 2010). Pictures and videos do not establish the distance between individuals in the frame or the volume of the conversation. 4/5 Tr. at 81:6-9 ("But the whole thing about *near* or *in proximity* or *at the scene* doesn't answer the question that I have been asking, which is can people who were near, at the

---

[5] The Government claims that the Court summarized Defendants' testimony as establishing that incriminating conversations were taking place in close proximity to members of the public. Dkt. 144 at 15-16. The Government conveniently leaves out the rest of the Court's statement: "[The other defendants' testimony] would show that they were having incriminatory conversations in proximity to people who were members of the public at the time they had a conversation, *but that we don't have evidence to show the volume of which these conversations took place, nor do we have evidence of showing the exact proximity of these individuals to the people who were having the conversation[.]*" 4/5 Tr. at 89:24-90:10 (emphasis added).

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

scene, or in proximity overhear the conversation?"); *id.* at 85:2-6 ("The question is are the remarks made in a conversation of such volume that a person who is not part of the conversation could overhear it? And for that you need either somebody coming in who can testify to that or scientific evidence establishing that."). The Government has offered no evidence that any bystander was close enough to overhear Defendants' conversations, or that Defendants spoke loudly enough that a passerby would have been able to listen in.

Beyond its failure of proof, the Government overemphasizes the legal significance of the potential for overhears. As the Court explained, "[t]here is in *every conversation* a potential to be overheard." *Id.* at 85:17 (emphasis added). That is precisely why the critical inquiry under the Fourth Amendment and Title III is not "whether it is *conceivable* that someone could eavesdrop on a conversation but whether it is *reasonable* to expect privacy." *Smith*, 978 F.2d at 179 (emphases in original). When citizens step away from a foreclosure auction and speak quietly amongst themselves near a courthouse entrance, they may reasonably expect that their conversation will remain private. *See Kee*, 247 F.3d at 215 n.18; Dkt. 136 at 24-31.[6]

## C. The Government Cannot Fault Defendants for Failing to Reconstruct the Factual Circumstances that It Ignored and Failed to Document.

The Government's position, if accepted, would require Defendants to reconstruct the specific factual circumstances of each individual conversation in the more than 214 hours of recordings—even though the Government has already conceded that it will not use any of the recordings. *See* Dkt. 144 at 1, 9, 11, 13; Dkt. 62 at 1, 7, 16-18. Not only is this position contrary to the pre-authorization mandate of Title III, but the Government carried out the surveillance in

---

[6] Regarding the sensitivity of the microphones, the Government misconstrues Agent Wynar's testimony. The Government claims that Agent Wynar testified that the microphones were "slightly less effective than" and "inferior to" a normal human ear. Dkt. 144 at 7. Agent Wynar offered conflicting testimony on this point, testifying both that the microphones were less effective than the human ear *and* equally as effective as the human ear. 2/11 Tr. at 201:19-24 ("slightly less effective"); *id.* at 212:22-24 ("as good as a human ear"); *id.* at 214:8-17 (a microphone at a particular location would hear exactly what a human being standing at that location would hear); *id.* at 215:12-17 ("inferior"); *id.* at 215:21-216:1 (33 dBA is "worse than a human ear, by a lot"). Agent Wynar is not an expert, but Defendants have not challenged his assertion that the microphone has around the same sensitivity as the normal human ear because the Court stated that understanding the sensitivity of the microphone was not dispositive, as long as the microphones are "basically similar to a human ear." *See id.* at 223:4-13.

LATHAM&WATKINS^LLP
ATTORNEYS AT LAW
SAN FRANCISCO

such a way that it is impossible to know what was happening during most of the recordings. In cases where the information necessary to decide the legality of the surveillance is in the exclusive possession of the government, or could have been preserved only by the government, the government cannot fault defendants for being unable to reconstruct the circumstances of the surveillance. *See United States v. Losing*, 539 F.2d 1174, 1180 (8th Cir. 1976) (holding that requiring defendants to prove failure to minimize based "solely on information derived from the tapes of some 1800 calls . . . is a tedious, if not impossible" task, particularly where the government, "at least in the beginning, was in exclusive possession of the information" necessary to prove failure to minimize); *United States v. Cantu*, 625 F. Supp. 656, 675 n.36 (N.D. Fla. 1985), *aff'd*, 791 F.2d 940 (11th Cir. 1986) (explaining that the government bears the ultimate burden of persuasion on minimization because "information regarding minimization may be exclusively within the possession of the Government").

For seven of the twenty-eight days on which the recording devices were used, the Government employed just the sprinkler box and planter box devices, which only captured audio. *See* Def. Ex. 2 (12/29/09, 2/3/10, 2/4/10, 2/17/10, 4/26/10, 5/21/10, 7/13/10); 2/11 Tr. at 205:6-10, 205:25-206:3. There were no video devices pointed at the sprinkler box or the planter box, recordings from which might have shown what was happening nearby.[7] Defendants also cannot rely on the FBI's surveillance reports to learn the circumstances of the recordings because, for six of the seven audio-only dates, there is either no report at all, Dkt. 136-1, ¶ 8 (2/17/10, 5/21/10, 7/13/10), or only a boilerplate report stating that "a surveillance was conducted" that included one or more "recording devices," Def. Exs. 10, 39. For the single audio-only date with a surveillance report, Agent Wynar made only a few general observations, which begin nearly an hour into the two-and-a-half hour recording. *See* Def. Ex. 27. Without video recordings or surveillance reports, and given that the recordings were made nearly six

---

[7] Consensual video recordings, to the extent they exist around the time of the audio-only stationary recordings, would not suffice to show the specific facts and circumstances at the time of the stationary recordings because the consensual video recordings would not have consistently captured the same speakers.

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANTS' REPLY ISO
POST-HEARING BRIEF
CASE NO. CR 14-00534-CRB

years ago, it is impossible to know the specific facts and circumstances of the recordings from the audio-only dates. *See* 2/11 Tr. at 172:5-173:5.

The Government agrees that it is impossible to know the specific facts and circumstances of the audio-only recordings, yet somehow still expects Defendants to offer such evidence. The Government admits that for the recording with file number 1D098 from February 17, 2010, "the proximity of others cannot be determined" because there was no video surveillance on that date. Dkt. 144 at 17. Yet, in the next sentence, the Government complains that Defendants have failed to "present[] any evidence that they took affirmative steps to keep [the February 17] conversation private." *Id.* The Government is asking the impossible.

It is not much easier to discern the facts and circumstances of the recordings from the twenty-one dates on which the Government employed both audio and video devices. First, even when there is a video recording, the speakers whose voices are captured are not always visible in the frame. *See, e.g.*, Def. Ex. 53 (1D041.003 at 20:19). Second, while Defendants could (in theory) look to the surveillance reports for a description of what was happening near the devices, the FBI's documentation was not thorough or consistent. For eight of the twenty-one audio-video dates, there is no surveillance report at all or only a boilerplate report. Dkt. 136-1, ¶ 8 (9/15/10); Def. Exs. 30-34, 37-38. Of the remaining thirteen dates, five have substantive, but non-contemporaneous reports. These reports profess to be an agent's interpretation of the recordings based on subsequent review; they are not a contemporaneous record of what was happening near the devices. Def. Exs. 41-42, 46-49. For the final eight dates, an FBI agent documented what he observed at the courthouse while the recording devices were activated. Def. Exs. 9, 18, 22, 28-29, 43-44, 50. Although these reports appear to be based on real-time observations of the auctions, some were created months after the fact, seriously calling into question their reliability. *E.g.*, Def. Ex. 9 (surveillance on 1/4/10; report dated 5/8/10); Def. Ex. 29 (surveillance on 1/11/10; report dated 5/9/10).

Finally, the Government admits that the full scope of the recordings is *still unknown*. Dkt. 144 at 6 n.2. In their opening brief, Defendants surmised that the Government had failed to disclose some of the stationary recordings. Dkt. 136 at 20 n.13. The Government replied that it

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

13

DEFENDANTS' REPLY ISO
POST-HEARING BRIEF
CASE NO. CR 14-00534-CRB

1  "believes" that one of the recordings identified by Defendants is in fact a stationary recording,

2  which was "mislabeled internally as a consensual recording" and thus not disclosed to the

3  defense.  Dkt. 144 at 6 n.2.  The Government expects Defendants to offer evidence of the

4  particular circumstances of each conversation in every recording, when the Government could

5  not even identify the complete set of stationary recordings that it made.  If there was any

6  question that the nature of this surveillance program makes a conversation-by-conversation

7  analysis impossible, the Government's eleventh-hour disclosure of yet another stationary

8  recording should end the matter.

9
       **D.      The Government Concedes that the Court Found Defendants Have Standing
10              to Challenge the Recordings Under *Oliva*.**

11        The Government acknowledges that the Court already found that Defendants have

12  standing to challenge the recordings under the Ninth Circuit's decision in *United States v. Oliva*,

13  705 F.3d 390, 395 (9th Cir. 2012), yet the Government spends several pages rehashing its

14  arguments.[8]  Dkt. 144 at 12 n.5; 2/11 Tr. at 15:19-20.  The Court should again conclude that, as

15  targets of the Government's unauthorized electronic surveillance program, Defendants have

16  standing to challenge the recordings.

17        A defendant may challenge the interception of oral communications under Title III as

18  long as he was "one of the individuals 'against whom the interception[s] w[ere] directed.'"

19  *Oliva*, 705 F.3d at 395 (quoting 18 U.S.C. § 2510(11)).  A defendant need not admit that he was

20  a party to any intercepted conversation, and the interceptions need not have occurred on his

21  premises.  *Id.*  A defendant also need not have been overheard on any of the recordings, as long

22  as he was a target of the electronic surveillance.  *United States v. Ortiz*, No. C 12-00119 SI, 2013

23  WL 6842537, at *3 (N.D. Cal. Dec. 27, 2013); *United States v. Cooper*, No. CR 09-00156 SI,

24

25  [8] The Government has always conceded, however, that Defendants have standing to challenge
   any recording in which they are captured.  Dkt. 144 at 13 ("The government acknowledges that
26  the defendants are captured on some of the stationary recordings.  More than a year ago, through
   a voluntary disclosure, the government identified 19 stationary recording files made on 12 days,
27  portions of which may contain recorded conversations of the defendants."); Dkt. 72 at 5 (stating
   that each Defendant has standing to challenge "those recordings in which he appears"); Dkt. 62
28  at 8-9 (same).

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

14

DEFENDANTS' REPLY ISO
POST-HEARING BRIEF
CASE NO. CR 14-00534-CRB

2014 WL 3784344, at *10-11 (N.D. Cal. July 31, 2014); *see also United States v. Glover*, No. 07-0152-04, 06 (ESH), 2016 WL 1273171, at *7-10 (D.D.C. Mar. 31, 2016). Contrary to the Government's argument, nothing in *Oliva* requires a defendant to have a possessory interest in the means of communication. *See* Dkt. 144 at 12 n.5. Indeed, in *Ortiz*, Judge Illston held that the defendants could challenge a wiretap even though their conversations were not intercepted and their telephones were not directly tapped. 2013 WL 6842537, at *3.

Defendants Giraudo, Grinsell, and Cullinane are listed as "interceptees" on Agent Wynar's FD-759, completed before the surveillance began. Def. Ex. 17 at 2. Under *Oliva*, they have standing to challenge all of the recordings. The Government agrees that Defendant Farag became a target on January 6, 2010, and that Defendant Appenrodt became a target on March 29, 2010. Dkt. 144 at 4; 2/29 Tr. at 182:22-183:7, 185:14-17, 194:8-23, 196:19-22; Def. Exs. 18 & 19. Farag and Appenrodt have standing to challenge all recordings on and after the dates on which they became targets.

The Government's focus on the absence of a citation to a recording that captures Farag or Appenrodt is misplaced. *See* Dkt. 144 at 1, 22. Under *Oliva*, Farag and Appenrodt need not have been overheard in order to challenge the recordings as of the date they were targets. Moreover, the Government *admits* that every defendant was captured on the recordings. Dkt. 144 at 13; Def. Ex. 15; *see also, e.g.*, Def. Ex. 53 (1D233.001_part3 at 25:59) (persons believed to be Farag and alleged co-conspirator Dan Rosenbledt discuss properties); Def. Ex. 53 (1D233.001_part 1 at 38:45 & 41:38) (person believed to be Appenrodt discusses partners and properties). To the extent that the Government expects Defendants to scrutinize 214 hours of recordings—or perhaps more, as the full scope of the recordings is still unknown—and determine every instance in which one or more Defendant(s) may have been overheard, the Government is asking the Court to reward it for the breadth of its illegal surveillance, as explained above. *See supra* Section A.

## III. CONCLUSION

Defendants respectfully request that the Court hold that the stationary recordings were obtained in violation of the Fourth Amendment and Title III and must be suppressed. The Court

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

should then turn the question of taint, at which point the parties will determine how specific recordings were used in this investigation and the evidence that was derived from them.[9]

DATED: July 1, 2016            Respectfully submitted,

               By  /s/ Ashley M. Bauer
                   Daniel M. Wall (Bar No. 102580)
                   Ashley M. Bauer (Bar No. 231626)
                   Alicia R. Jovais (Bar No. 296172)
                   LATHAM & WATKINS LLP
                   505 Montgomery Street, Suite 2000
                   San Francisco, CA 94111-6538
                   Telephone: (415) 391-0600
                   Fax: (415) 395-8095
                   dan.wall@lw.com
                   ashley.bauer@lw.com
                   alicia.jovais@lw.com

                   *Attorneys for Defendant Abraham S. Farag*

               By  /s/ Matthew J. Jacobs
                   Matthew J. Jacobs (Bar No. 171149)
                   VINSON & ELKINS LLP
                   525 Market Street, Suite 2750
                   San Francisco, CA 94105
                   Telephone: (415) 979-6990
                   Fax: (415) 651-8786
                   mjacobs@velaw.com

                   *Attorney for Defendant Joseph J. Giraudo*

---

[9] The Government's arguments regarding taint are premature. *See* Dkt. 144 at 8-9 (broadly claiming that the stationary recordings were not used to further the investigation), 23-24 (same). The Government has already conceded that the Court must decide whether there has been a violation of the Fourth Amendment and Title III before turning to the question of taint, *see* 2/11 Tr. at 7:7-11, and the Government admits that at least some of the recordings had evidentiary value, Dkt. 144 at 23.

Taint is probable here, as Agent Wynar's testimony establishes that the recordings were a powerful investigative tool. *See* Dkt. 136 at 20-21. Agent Wynar reviewed every one of the recordings, some of them more than once. 2/11 Tr. at 39:3-9, 106:9-16; Def. Exs. 46-47. He will need to testify about whether and how the recordings influenced the investigation. Further, Agent Bond testified that she could not say whether any stationary recordings were shown to counsel for Defendants in an effort to convince them to plead guilty. 2/29 Tr. at 229:5-8, 229:21-230:8, 230:13-21, 230:22-231:13.

By  /s/ Louis P. Feuchtbaum
Louis P. Feuchtbaum (Bar No. 219826)
SIDEMAN & BANCROFT LLP
1 Embarcadero Center, 22nd Floor
San Francisco, CA 94111
Telephone: (415) 392-1960
Fax: (415) 392-0827
lfeuchtbaum@sideman.com


*Attorney for Defendant Raymond A. Grinsell*


By  /s/ Doron Weinberg
Doron Weinberg (Bar No. 46131)
LAW OFFICES OF DORON WEINBERG
523 Octavia Street
San Francisco, CA 94102
Telephone: (415) 431-3472
Fax: (415) 552-2703
doronweinberg@aol.com


*Attorney for Defendant Kevin B. Cullinane*


By  /s/ Jeffrey L. Bornstein
Jeffrey L. Bornstein (Bar No. 99358)
ROSEN BIEN GALVAN & GRUNFELD LLP
50 Fremont Street, Floor 19
San Francisco, CA 94105
Telephone: (415) 433-6830
Fax: (415) 433-7104
jbornstein@rbgg.com


*Attorney for Defendant James F. Appenrodt*


## CIVIL LOCAL RULE 5-1(i)(3)

Pursuant to Civil Local Rule 5-1(i)(3), I attest that concurrence in the filing of this

document has been obtained from each of the other Signatories hereto.


/s/ Ashley M. Bauer
Ashley M. Bauer
Attorney for Defendant Abraham S. Farag

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

17

DEFENDANTS' REPLY ISO
POST-HEARING BRIEF
CASE NO. CR 14-00534-CRB