1    LATHAM & WATKINS LLP
          Daniel M. Wall (Bar No. 102580)
2              dan.wall@lw.com
          Ashley M. Bauer (Bar No. 231626)
3              ashley.bauer@lw.com
          Alicia R. Jovais (Bar No. 296172)
4              alicia.jovais@lw.com
     505 Montgomery Street, Suite 2000
5    San Francisco, California  94111-6538
     Telephone:  +1.415.391.0600
6    Facsimile:  +1.415.395.8095

7    *Attorneys for Defendant Abraham S. Farag*

8    *Additional Counsel on Signature Page*

9

10                      UNITED STATES DISTRICT COURT

11                    NORTHERN DISTRICT OF CALIFORNIA

12                        SAN FRANCISCO DIVISION

13

14   UNITED STATES OF AMERICA,            CASE NO. CR 14-00534 CRB

15                  Plaintiff,            **DEFENDANTS' RESPONSE TO**
                                          **GOVERNMENT'S BRIEF REGARDING USE**
16          v.                            **OF STATIONARY AUDIO RECORDINGS**

17   JOSEPH J. GIRAUDO, RAYMOND A.
     GRINSELL, KEVIN B. CULLINANE,
18   JAMES F. APPENRODT, and
     ABRAHAM S. FARAG,
19
                    Defendants.
20

21

22

23

24

25

26

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFS.' RESPONSE TO GOVERNMENT'S
BRIEF RE: USE OF RECORDINGS
CASE NO. CR 14-00534-CRB

# TABLE OF CONTENTS

**Page**

I.  SUMMARY OF ARGUMENT ................................................................................. 1

II.  ARGUMENT .................................................................................................... 4

    A.  The Government Cannot Satisfy Its Burden on Taint Because It
    Does Not Know How the Recordings Were Used................................................ 4

        1.  The Declarations of Agent Wynar and Agent Bond Reveal
        Holes in the Government's Submission.................................................... 4

        2.  The Government's Records Are Incomplete and Unreliable.................... 5

        3.  Because the Government Does Not Know How the
        Recordings Were Used, the Court Should Suppress All
        Evidence Obtained After the Illegal Recording Scheme
        Began. ................................................................................................. 8

    B.  In the Alternative, the Government Must Specifically Identify the
    Evidence It Intends to Rely on at Trial and Produce the Records
    and Testimony Necessary to Establish that Its Evidence Is
    Untainted............................................................................................................ 8

        1.  The Government Must Produce All Materials Relating to
        the Use of the Illegal Recordings.............................................................. 9

        2.  Defendants Are Entitled to Cross-Examine the FBI Agents
        and Government Attorneys Who Investigated this Case. ........................ 10

        3.  The Government Must Produce Evidence Establishing that
        the Testimony of Cooperators Whose Counsel Were Shown
        Illegal Recordings During Plea Negotiations Is Untainted..................... 12

III.  CONCLUSION................................................................................................. 15

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Alderman v. United States,*
394 U.S. 165 (1969)..................................................................................... *passim*

*Baker v. United States,*
430 F.2d 499 (D.C. Cir. 1970) ...............................................................10, 11

*Greenpeace v. Nat'l Marine Fisheries Serv.,*
198 F.R.D. 540 (D. Nev. 2000)...................................................................9

*Hemstreet v. Duncan,*
No. CV-07-732-ST, 2007 WL 4287602 (D. Or. Dec. 4, 2007)...............9

*Matsuura v. E.I. du Pont de Nemours & Co.,*
330 F. Supp. 2d 1101 (D. Haw. 2004), *rev'd on other grounds*, 431 F.3d 353
(9th Cir. 2005).............................................................................................13

*Moreno v. Autozone, Inc.,*
No. C-05-4432 CRB (EMC), 2008 WL 906510 (N.D. Cal. Apr. 1, 2008)..............................9

*Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship,*
507 U.S. 380 (1993).....................................................................................12

*United States v. Ailemen,*
43 F. App'x 77 (9th Cir. 2002) ................................................................13

*United States v. Ceccolini,*
435 U.S. 268 (1978)..................................................................3, 12, 13, 15

*United States v. Davis,*
332 F.3d 1163 (9th Cir. 2003) .................................................................12

*United States v. Ghailani,*
743 F. Supp. 2d 242 (S.D.N.Y. 2010).................................................13, 15

*United States v. Giordano,*
440 F.2d 449 (6th Cir. 1971) ...............................................................3, 10

*United States v. Hooten,*
662 F.2d 628 (9th Cir. 1981) .................................................................14

*United States v. Huss,*
482 F.2d 38 (2d Cir. 1973)........................................................................9

ii

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*United States v. Leonardi,*
    623 F.2d 746 (7th Cir. 1980) .................................................................................................14

*United States v. Polizzi,*
    500 F.2d 856 (9th Cir. 1974) ........................................................................................3, 4, 11

*United States v. Ramirez-Sandoval,*
    872 F.2d 1392 (9th Cir. 1989) ........................................................................................13, 14

*United States v. Seale,*
    461 F.2d 345 (7th Cir. 1972) .................................................................................................10

*United States v. Shetler,*
    665 F.3d 1150 (9th Cir. 2011) ........................................................................................14, 15

## OTHER AUTHORITIES

2 Law of Electronic Surveillance § 6:51 ...........................................................................................3

LATHAM&WATKINSᴸᴸᴾ
ATTORNEYS AT LAW
SAN FRANCISCO

DEFS.' RESPONSE TO GOVERNMENT'S
BRIEF RE: USE OF RECORDINGS
CASE NO. CR 14-00534-CRB

1    I.      SUMMARY OF ARGUMENT

2           The Government now claims that 218 hours of illegal recordings, which FBI agents

3    believed were "gold," "important," and "incriminating" at the time they were made, and many of

4    which the Government identified in May 2015 as among the exhibits it intends to use at trial,

5    yielded absolutely no investigative leads, additional subjects, or new evidence.  2/29 Tr. at

6    65:13-67:3, 106:17-25; Def. Exs. 14-15.  The Government asks us to believe this even though it

7    admits that the illegal recordings were shown to counsel for alleged conspirators in an effort to

8    convince them to plead guilty, played during or made available prior to witness interviews, and

9    reviewed and analyzed by FBI Agents Wynar and Bond.  And just two days ago, the

10   Government disclosed for the first time that Antitrust Division attorneys and paralegals created

11   various internal notes and memos referencing the illegal recordings.  Defendants are skeptical of

12   the Government's claims that the illegal recordings led to no other evidence, and the Court

13   should be as well.  Such claims should be thoroughly scrutinized and tested in adversary

14   proceedings.  *See Alderman v. United States*, 394 U.S. 165, 185 (1969).

15          In fact, the Government's submission reveals that it does not know how the illegal

16   recordings were used.  One glaring example of the holes in the Government's understanding is

17   found on the face of Agent Wynar's and Agent Bond's Declarations.  Neither Agent Bond nor

18   Agent Wynar specifically recalls reviewing some of the illegal recordings cited in the

19   Government's brief and referenced in the FBI's own records.  This inconsistency is not

20   surprising given the scope of the illegal recording scheme and the Government's incomplete and

21   unreliable documentation of its use of the recordings.  The FBI illegally amassed 218 hours of

22   conversations over nine months, but made no effort to segregate the stationary recordings from

23   the consensual recordings—in fact there was "*no real distinction in [the agents'] minds between*

24   *the two*."  2/29 Tr. at 191:10-15 (emphasis added).  Two of the illegal recordings were

25   mislabeled internally until 2016.  Agent Wynar only "sometimes" reported on what he learned

26   listening to "most if not all" of the illegal recordings, Dkt. 164-26, ¶¶ 23, 26, and some of the

27   FBI's transcripts and notes do not even indicate which recordings were reviewed to create them.

28

1

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFS.' RESPONSE TO GOVERNMENT'S
BRIEF RE: USE OF RECORDINGS
CASE NO. CR 14-00534-CRB

1   In light of the glaring deficiencies in its documentation of the use of the illegal recordings, the

2   Government cannot establish that it did not derive any evidence from them.

3   Because the Government cannot establish that it did not derive any evidence from the

4   illegal recordings, the Court should suppress all of the evidence collected after the illegal

5   recording scheme began on December 22, 2009.  The only alternative is for the Government to

6   specifically identify the evidence that it will seek to introduce at trial and establish an

7   independent source for each item.  If the Government is allowed to attempt to make such a

8   showing, Defendants must be permitted to test the Government's representations.  The Court

9   should (1) order the Government to specifically identify how its evidence was obtained, (2) order

10   the Government to produce any materials not yet disclosed relating to the use of any illegal

11   recording by any government agent, (3) set a hearing date for cross-examination of Agent

12   Wynar, Agent Bond, and the prosecutors who investigated the case, and (4) order the

13   Government to produce evidence establishing that the cooperating witnesses whose counsel were

14   shown illegal recordings during plea negotiations were not induced to testify as a result.

15   In an attempt to obtain the information necessary to evaluate the Government's claims,

16   Defendants met and conferred with the Government on September 16, 2016, and requested the

17   opportunity to examine the Government's agents either informally or in court.  Bauer Decl., ¶ 4.

18   Defendants followed up with a meet-and-confer letter on September 21, 2016, requesting

19   documents such as records underlying Agent Bond's and Agent Wynar's assertions about their

20   use of the illegal recordings and records relating to the use of the illegal recordings in meetings

21   with cooperators and/or their counsel.  *See* Bauer Decl., Ex. A (Sept. 21, 2016 letter).  The

22   Government responded to this letter on September 28, 2016.  Bauer Decl., Ex. B (Sept. 28, 2016

23   letter).  The Government refused to make any of its employees available for informal interviews.

24   *Id.* at 5.  Although the Government produced some of its records, it withheld others on the

25   grounds that Defendants' requests are overbroad and that the information sought is protected by

26   various privileges.  *Id.* at 1.  The records that were produced confirm that it is unlikely that the

27   Government could ever say with any reasonable certainty how, when, and by whom the illegal

28   recordings were used.

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFS.' RESPONSE TO GOVERNMENT'S
BRIEF RE: USE OF RECORDINGS
CASE NO. CR 14-00534-CRB

1    It is well settled that Defendants are entitled to cross-examine the FBI agents and

2   prosecutors who investigated the case regarding the connection between the illegal recordings

3   and the evidence the Government intends to use at trial.  *See, e.g.*, *Alderman*, 394 U.S. at 185;

4   *United States v. Polizzi*, 500 F.2d 856, 912-13 (9th Cir. 1974) (district court permitted the

5   defense to examine prosecutors on the witness stand in an *Alderman* hearing); *United States v.*

6   *Giordano*, 440 F.2d 449, 451 (6th Cir. 1971) (where the government's records of electronic

7   surveillance are incomplete, testimony of government agents may be necessary to assess taint);

8   *see also* 2 Law of Electronic Surveillance § 6:51 (witnesses at a taint hearing may "includ[e], if

9   necessary, prosecutors").  Defendants need to test Agent Wynar's and Agent Bond's claims

10   that—although they kept recording for 218 hours, did not distinguish between stationary and

11   consensual recordings, and only sometimes wrote down what they learned from their review of

12   the recordings—nothing on the illegal recordings significantly directed the investigation.

13   Defendants also need to question the attorneys who investigated this case regarding how they

14   used the recordings.  Plea negotiation meetings were not memorialized in 302s or paralegal

15   write-ups, Bauer Decl., Ex. B (Sept. 28, 2016 letter) at 3, and Paralegal Specialist Susi drafted

16   her declaration based on information provided  by unidentified "government attorneys" who

17   were "present during plea negotiation meetings and calls."  Dkt. 164-21, ¶ 6.  Agent Wynar

18   testified that information flowed freely between the FBI and the Antitrust Division attorneys,

19   who "trusted [Wynar] to keep them informed" about the recordings.  2/11 Tr. at 98:6-14.  And

20   Antitrust Division attorneys and paralegals drafted various internal notes and memos referring to

21   the illegal recordings.  Bauer Decl., Ex. B (Sept. 28, 2016 letter) at 3.

22    The Court should also require the Government to offer evidence sufficient to establish

23   that the testimony of Rezaian and Rosenbledt, the cooperators whose counsel were shown illegal

24   recordings during plea negotiations, was not induced by the illegal recordings.  Witness

25   testimony is tainted if it was induced by the fruits of an illegal search.  *See United States v.*

26   *Ceccolini*, 435 U.S. 268, 279 (1978).  The Government claims that the role of the illegal

27   recordings was minimal, but over twenty-five percent of the audio/video played for Rosenbledt's

28   counsel was from a stationary audio device.  More importantly, only Rezaian and Rosenbledt can

1   say whether their cooperation was induced by the illegal recordings. The Government tried to

2   obtain affidavits from them regarding the impact of the illegal recordings on their decisions to

3   cooperate, but failed to do so. *See* Bauer Decl., Ex. B (Sept. 28, 2016 letter) at 4.

4          The Government cannot satisfy its burden on taint because it failed to keep accurate and

5   complete records regarding the use of the illegal recordings. The Court should therefore

6   suppress all of the Government's evidence collected after the illegal recording scheme began on

7   December 22, 2009. In the alternative, if the Government is allowed to proceed by specifically

8   identifying the evidence it intends to use at trial and attempting to establish an untainted chain

9   for each item, Defendants are entitled to test the Government's representations. The Court

10  should set a hearing at which Agent Wynar, Agent Bond, and the prosecutors who participated in

11  the investigation of the case will be available for cross-examination. Prior to that hearing, the

12  Court should also order the Government to produce all records relating to the use of the illegal

13  recordings that have not already been disclosed to the defense, and to offer evidence that the

14  cooperators whose counsel were shown illegal recordings during plea negotiations were not

15  induced to testify as a result.

16  **II.    ARGUMENT**

17         **A.    The Government Cannot Satisfy Its Burden on Taint Because It Does Not
18                Know How the Recordings Were Used.**

19         The Government has the ultimate burden to establish that none of its evidence is derived

20  from the illegal recordings. *Alderman*, 394 U.S. at 183; *see also Polizzi*, 500 F.2d at 910. The

21  Government cannot satisfy this burden here because the declarations and testimony of its agents

22  and the records produced to date reveal that the Government failed to consistently, thoroughly, or

23  accurately document its use of the illegal recordings.

24                **1.    The Declarations of Agent Wynar and Agent Bond Reveal Holes in
25                        the Government's Submission.**

26         To support its broad assertion that the FBI never used the recordings "to direct the

27  investigation, identify new subjects, develop new leads, or obtain any new evidence," Dkt. 164

28  at 4, the Government offers the declarations of two FBI agents regarding their review of the

1  recordings.  Special Agent Roahn Wynar, the "primary agent responsible for reviewing the

2  stationary recordings," Dkt. 164-26, ¶ 23, recalls reviewing only three stationary audio

3  recordings during the investigation that he believed were potentially incriminating:

4  1D069.001_part3.wav, 1D143.001_part3.wav, and 1D233.001_part.wav.  *Id.* ¶ 29.  Special

5  Agent Deborah Bond, the "lead case agent" who "infrequently" reviewed the recordings, Dkt.

6  164-1, ¶¶ 2, 4, recalls reviewing only three stationary audio recordings apart from what was

7  played during plea negotiation meetings and witness interviews: 1D037.002_part4.wav,

8  1D069.001_part3.wav, and 1D143.001_part3.wav.[1]  *Id.* ¶ 8.  The basis for these declarations is

9  not clear.  It is unlikely that, years later, Agent Wynar and Agent Bond recall from memory

10  which of hundreds of file numbers they reviewed, but the Government has not specified the

11  documents, if any, on which the agents may have relied.  In fact, the Government's own

12  submission and its recent document productions indicate that the Wynar and Bond Declarations

13  do not tell the whole story.  Neither Agent Bond nor Agent Wynar specifically recalls reviewing

14  some of the illegal recordings discussed in the Government's brief and referenced in the FBI's

15  own records.

16              **2.      The Government's Records Are Incomplete and Unreliable.**

17          The Government's inability to say with any certainty how the recordings were used is not

18  surprising given the scope of the illegal recording scheme and the failure to distinguish between

19  stationary and consensual recordings in the case file.  The Government illegally captured 218

20  hours[2] of conversations on at least twenty-eight days over the course of ninth months.  2/29 Tr. at

21  156:11-15; 2/11 Tr. at 43:17-21, 47:3-20.  The same devices were used to make stationary and

22  consensual recordings.  2/11 Tr. at 218:12-18; Bauer Decl., Ex. B (Sept. 28, 2016 letter) at 4.

23  The FBI made no effort to segregate the stationary recordings from the consensual recordings in

24  the case file.  Agent Wynar was clear that there was "no special isolation" of the stationary

---

25

26  [1] 1D143.001_part3.wav was in fact played during a plea negotiation meeting.  Dkt. 164-21, ¶ 17.

27  [2] Agent Wynar previously testified that the FBI illegally amassed 214 hours of conversations.  2/29 Tr. at 156:11-15.  Since that testimony, the Government has admitted that an additional recording with file number 1D052 is also an illegal recording, *see* Dkt. 144 at 6 n.2, bringing the

28  total number of hours of illegal recordings to 218.  *See* Bauer Decl., ¶ 14.

1    recordings, 2/29 Tr. at 190:14-191:2, that the case "library" was a "combination of the

2    consensual and the nonconsensual electronic surveillance," *id.* at 191:3-9, and that "[t]here was

3    *no real distinction in [the agents'] minds*" between the stationary recordings and the consensual

4    recordings, *id.* at 191:10-15 (emphasis added).  With hundreds of hours of illegal and consensual

5    recordings mixed up in a single vault, it is unlikely that the Government could ever credibly

6    represent that it knows when and how each illegal recording was used in the investigation.

7        Consistent with the lack of segregation in the case file, at least two illegal recordings

8    were mislabeled until 2016—over six years after the recording scheme began.  On February 8,

9    2016, just three days before the first suppression hearing, the Government disclosed for the first

10   time that in addition to the sprinkler box, planter box, and vehicle devices, the FBI had planted a

11   recording device in a backpack and left the backpack unattended at the auction.  Def. Ex. 7.  The

12   backpack recording had been "mislabeled" and "that mislabeling perpetuated itself for the

13   duration of the investigation."  2/11 Tr. at 116:3-19.  Agent Wynar, the person responsible for

14   the illegal recordings, could not remember the day on which the backpack device was used and

15   could offer "no explanation" for the mislabeling.  *Id.* at 116:11-19.

16       Even more concerning is the fact that *Defendants* had to point out the existence of an

17   additional illegal recording that the Government had "mislabeled internally" as a consensual

18   recording.  *See* Dkt. 136 at 20 n.13; Dkt. 144 at 6 n.2.  The recording with file number 1D052

19   has several indicators that it is nonconsensual, but it was not included on the Government's list

20   of stationary recordings.  Dkt. 136-1, ¶ 5; Def. Ex. 2.  Defendants raised the possibility that

21   1D052 was an undisclosed stationary recording, and on June 17, 2016, the Government revealed

22   for the first time that 1D052 was in fact "a stationary recording from January 14, 2010 that was

23   mislabeled internally as a consensual recording."  Dkt. 136 at 20 n.13; Dkt. 144 at 6 n.2.  If

24   illegal recordings were mislabeled in the Government's case file, agents and attorneys may have

25   listened to and learned from those recordings without realizing what they were listening to.  That

26   makes it impossible for the Government to definitively state that it did not derive any evidence

27   from the illegal recordings.

28

6

1    As the Court recognized in its August 1, 2016 Order, *see* Dkt. 150 at 8-9, the FBI's

2  documentation of its review of the recordings is generally unreliable.  For example, an "FBI

3  Rough-Draft Transcript" produced on September 16, 2016—a week after the Government filed

4  its brief on taint—does not even indicate which recordings were reviewed, let alone by whom

5  and when.  *See* Bauer Decl., Ex. E (NDRE-FBI-0637).  The index accompanying the production

6  states that there are "various sources" for this transcript, "*possibly* including 1D563, 1D564, or

7  1D566."  Bauer Decl., Ex. D (Sept. 16, 2016 Production Index) (emphasis added).  Neither

8  Agent Wynar nor Agent Bond recalls reviewing 1D563, 1D564, or 1D566, and 1D563 and

9  1D566 are not even mentioned in the Government's submission.  In addition, just two days ago,

10  the Government produced Agent Wynar's notes about the Penhurst auction, which are based on

11  "audio transcripts, video recordings, and CHS interviews" and which "*may* refer to both

12  consensual and stationary recordings."  Bauer Decl., Ex. B (Sept. 28, 2016 letter) at 2 (emphasis

13  added).  The Government also disclosed that Agent Bond *may* have edited two of the transcripts

14  of the illegal recordings, and that cooperator Mike Navone *may* have been shown a PowerPoint

15  presentation containing audio/video during a plea negotiation meeting.  *Id.* at 2-3.  Defendants

16  and the Court simply cannot rely on such inadequate recordkeeping to determine whether the

17  extensive illegal electronic surveillance directed the Government's investigation.

18    Further, even if the Government's records had the necessary information, its

19  recordkeeping was not consistent.  Agent Wynar reviewed "most if not all of the stationary

20  recordings," Dkt. 164-26, ¶ 23, but only "sometimes" wrote a FISUR report, *id.* ¶ 26; 2/11 Tr. at

21  178:1-15.  He claims to have "typically" written a report if the recording contained "relevant" or

22  "important" information.  Dkt. 164-26, ¶ 26; 2/11 Tr. at 178:1-15.  But Agent Wynar admits that

23  what he considered relevant or important changed over time, *see* 2/29 Tr. at 65:13-67:3

24  (distinguishing between "what we viewed as incriminating at that time [of the recordings] and

25  what we understand to be incriminating now"), meaning there was no clear distinction between

26  recordings whose review would have been documented and those whose review would not have

27  been.  Moreover, the Government admits that Agent Wynar's records contain errors.  After

28  Defendants pointed out that a report from February 12, 2010—not one of the dates on the

7

1     Government's list of stationary recordings—is nearly identical to ten boilerplate reports that the

2     Government admits discuss the use of stationary devices, the Government admitted that it

3     "believes" the February 12 report contains "a typographical error" and actually corresponds to

4     stationary recordings from February 16, 2010. *See* Dkt. 136 at 20 n.13; Dkt. 144 at 6 n.2.

5            **3.**       **Because the Government Does Not Know How the Recordings Were Used, the Court Should Suppress All Evidence Obtained After the**

6                   **Illegal Recording Scheme Began.**

7        The Government cannot establish that it did not derive any evidence from the illegal

8     recordings because it failed to accurately and completely document how the recordings were

9     used. The Court should therefore suppress all of the Government's evidence collected after the

10     illegal recording scheme commenced on December 22, 2009. Any other rule would reward the

11     Government for its poor recordkeeping, allowing the FBI and the Antitrust Division to make

12     illegal recordings and then claim that no evidence was derived from them because there are no

13     records documenting each use of the illegally seized conversations.

14          **B.**       **In the Alternative, the Government Must Specifically Identify the Evidence It Intends to Rely on at Trial and Produce the Records and Testimony**

15                 **Necessary to Establish that Its Evidence Is Untainted.**

16        The only alternative to suppression of all evidence collected after the illegal recording

17     scheme began is for the Government to specifically identify the evidence that it intends to rely on

18     at trial and to establish an untainted chain for each item. If the Government is allowed to

19     proceed on that basis, Defendants and the Court must have access to the records and testimony

20     necessary to scrutinize the Government's representations. The Court should require the

21     Government to produce any materials not already disclosed relating to the use of any illegal

22     recording by any government agent, set a hearing date for cross-examination of the FBI agents

23     and prosecutors who participated in the investigation of the case, and require the Government to

24     produce evidence establishing that the cooperators whose counsel were shown illegal recordings

25     during plea negotiations were not induced to testify as a result.

26

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1          **1.     The Government Must Produce All Materials Relating to the Use of**
2          **the Illegal Recordings.**

3          Where the Government's disclosures regarding illegal electronic surveillance are

4   inaccurate or incomplete, the Government cannot cure its failure to maintain and produce the

5   relevant records with unsupported assertions.  Disclosure of the records relating to the use of the

6   illegal recordings is critical because Defendants cannot be "left entirely to reliance on

7   government testimony."  *Alderman*, 394 U.S. at 183; *see also United States v. Huss*, 482 F.2d 38,

8   50 n.9 (2d Cir. 1973) (refusing to accept the government's "representations [about which agents

9   listened to which recordings] in lieu of evidence" and holding that testimony was tainted).  This

10  is especially true where there is reason to believe that the Government does not actually know

11  how the illegal recordings were used.

12         Although the Government produced some of the records requested in Defendants'

13  September 21, 2016 letter, it continues to withhold records on the grounds that the requests are

14  overbroad and that some of the information sought is protected by the law enforcement privilege,

15  the deliberative process privilege, and the work-product doctrine.  Bauer Decl., Ex. B (Sept. 28,

16  2016 letter) at 1.  Defendants requested a privilege log from the Government on September 30,

17  2016, and the meet-and-confer process is ongoing.  Bauer Decl., Ex. C (Sept. 30, 2016 letter).

18  Defendants maintain that all records relating to the use of the illegal recordings are necessary to

19  substantiate the Government's sweeping claims of non-use.  The privileges and protections cited

20  by the Government are not absolute.  *See Greenpeace v. Nat'l Marine Fisheries Serv.*, 198

21  F.R.D. 540, 543 (D. Nev. 2000) (deliberative process privilege is "narrowly construed" and "not

22  absolute"; the court "must determine whether the need for the evidence overrides the

23  government's interest in non-disclosure"); *Hemstreet v. Duncan*, No. CV-07-732-ST, 2007 WL

24  4287602, at *2 (D. Or. Dec. 4, 2007) (where records are "relevant and essential" to resolution of

25  the case, the law enforcement privilege is overcome); *Moreno v. Autozone, Inc.*, No. C-05-4432

26  CRB (EMC), 2008 WL 906510, at *1 (N.D. Cal. Apr. 1, 2008) (work-product protection is

27  "qualified" and may be overcome upon a showing of "substantial need").

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFS.' RESPONSE TO GOVERNMENT'S
BRIEF RE: USE OF RECORDINGS
CASE NO. CR 14-00534-CRB

1

**2.      Defendants Are Entitled to Cross-Examine the FBI Agents and Government Attorneys Who Investigated this Case.**

2

3          It is well settled that a defendant has "the right to cross-examine the appropriate officials

4   in regard to the connection between [records of overheard conversations] and the case made

5   against him." *Alderman*, 394 U.S. at 185.  Cross-examination is essential to test the

6   Government's representations regarding its use of illegally obtained evidence.  *See, e.g.*, *United*

7   *States v. Seale*, 461 F.2d 345, 365 (7th Cir. 1972) ("[S]worn testimony, subject to cross-

8   examination, of relevant Government witnesses must be submitted . . . to show lack of taint.");

9   *Giordano*, 440 F.2d at 450 ("[T]he Government must produce the federal agents responsible for

10  investigating the case, so that the defendant may cross-examine them concerning the extent of

11  dissemination.").  A defendant should therefore be afforded "ample opportunity . . . to probe the

12  source" of potentially tainted evidence, including by "intensive cross-examination" of FBI agents

13  and prosecutors.  *Baker v. United States*, 430 F.2d 499, 500-02 (D.C. Cir. 1970).

14         Here, Defendants are entitled to cross-examine Agent Wynar, Agent Bond, and any other

15  government agent who reviewed or was told about any of the illegal recordings.  It is critical to

16  test Wynar's and Bond's Declarations because there was "*no real distinction in [their] minds*"

17  between the stationary recordings and the consensual recordings during the investigation.  2/29

18  Tr. at 191:10-15 (emphasis added).  The illegal recording scheme continued for nine months,

19  capturing 218 hours of stationary recordings and over a thousand hours of consensual recordings,

20  with "no special isolation" of the stationary material.  *Id.* at 190:14-191:2.  At least two of the

21  illegal recordings were mislabeled internally until 2016, and the agents' documentation of their

22  review of the recordings is incomplete and unreliable.  *See supra* Section II.A.  Yet both Agent

23  Wynar and Agent Bond have represented that nothing they learned from the illegal recordings

24  ever directed the investigation in any significant way.  Agent Bond somehow makes this

25  representation even though she cannot recall, not even approximately, when she reviewed two of

26  the three illegal recordings that she remembers listening to.  Dkt. 164-1, ¶¶ 15, 17.  Defendants

27  must be permitted to probe these claims.

28

10

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFS.' RESPONSE TO GOVERNMENT'S
BRIEF RE: USE OF RECORDINGS
CASE NO. CR 14-00534-CRB

1       Defendants are also entitled to cross-examine the prosecutors who investigated this case.

2   Courts allow defendants to cross-examine prosecutors at taint hearings where there is reason to

3   believe the prosecutors may have received information derived from the illegal search. *See, e.g.*,

4   *Polizzi*, 500 F.2d at 912-13 (district court ordered the government to provide the defendants with

5   the names of all prosecutors so that the defendants could ask each prosecutor on the witness

6   stand whether he or she had received any information about the unlawful wiretap); *Baker*, 430

7   F.2d at 500 (defendant allowed to conduct "intensive cross-examination" of trial attorneys, IRS

8   agents, and FBI agents).  Here, many of the lead Government attorneys on the investigation at

9   the time that the illegal recordings were made and prior to indictment no longer work for the

10  Government, Bauer Decl., ¶ 15, and the Government has provided almost no information

11  regarding which, if any, Government attorneys reviewed the illegal recordings and when.

12      The information that is available strongly suggests that the prosecutors reviewed the

13  illegal recordings.  In April 2010, Agent Wynar brought illegal recordings and information

14  derived from them when he approached prosecutors seeking a Title III warrant for Rezaian's

15  phone.  2/29 Tr. at 105:5-10; 2/11 Tr. at 77:4-8; Dkt. 164-26, ¶ 40.  Since November 2011, the

16  Antitrust Division has had its own copies of the illegal recordings.  Bauer Decl., Ex. B (Sept. 28,

17  2016 letter) at 3.  More generally, information flowed freely between the prosecutors and the FBI

18  agents: "The Antitrust Division is a very, very active participant in these cases," 2/11 Tr. at

19  95:11-25, and at least in the period leading up to the illegal recording scheme, "[t]here was a lot

20  of information flowing between case agents and the prosecutors," *id.* at 96:2-9, who would

21  "interact[] on a daily basis face to face," *id.* at 97:4-9.  The prosecutors approved the recording

22  program, *id.* at 96:15-20, and "trusted [Wynar] to keep them informed about what [he] was

23  doing," *id.* at 98:6-14.  This frequent exchange of information warrants cross-examination of the

24  prosecutors regarding whether they were shown or told about the contents of the illegal

25  recordings.  Indeed, various Antitrust Division notes and memos refer to the illegal recordings.

26  Bauer Decl., Ex. B (Sept. 28, 2016 letter) at 3.

27      Further, the prosecutors would have attended the plea negotiation meetings and witness

28  interviews during which the Government admits illegal recordings were played.  Cross-

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

examination of the prosecutors is essential because plea negotiation meetings were not memorialized in 302s or paralegal write-ups. *Id.*  Further, Paralegal Specialist Susi based her declaration on "information provided by" unidentified "government attorneys" who were "present during plea negotiation meetings and calls." Dkt. 164-21, ¶ 6.  Agent Bond testified that she did not know whether stationary recordings were played during plea negotiations, but she could find out by "talk[ing] to the attorneys," who may have taken notes during the meetings. 2/29 Tr. at 231:5-16.  And the Government has produced four transcripts of illegal recordings prepared by DOJ, three of which were prepared just before the witness interviews at which they were shown and one of which was prepared in December 2012, long before indictment.  *See* Bauer Decl., Exs. D (Sept. 16, 2016 Production Index), F (NDRE-DOJ-000223), G (NDRE-DOJ-000232), H (NDRE-DOJ-000233), and I (NDRE-DOJ-000235).  The Court does not have to accept the second-hand knowledge of a paralegal and the broad, unsupported statements in the Government's brief; Defendants are entitled to cross-examine the prosecutors themselves, who surely reviewed or received information from the illegal recordings.

> **3.**      **The Government Must Produce Evidence Establishing that the Testimony of Cooperators Whose Counsel Were Shown Illegal Recordings During Plea Negotiations Is Untainted.**

        The Government admits that counsel for two cooperators were shown illegal recordings during plea negotiations: Rezaian's counsel was shown a clip of 1D151.002.avi, and Rosenbledt's counsel was shown clips of 1D151.002.avi and 1D143.001_part3.wav. Dkt. 164-21, ¶¶ 7, 15, 17.  Courts have long held that witness testimony is tainted if it was induced by the fruits of an illegal search.  *See Ceccolini*, 435 U.S. at 279; *United States v. Davis*, 332 F.3d 1163, 1171 (9th Cir. 2003).  Here, the Government must offer evidence—not unsupported assertions— that the testimony of Rezaian and Rosenbledt was not induced by the illegal recordings.

        As a preliminary matter, the fact that counsel for Rezaian and Rosenbledt, rather than Rezaian and Rosenbledt themselves, were shown the illegal recordings makes no difference. That is because a client "is considered to have notice of all facts, notice of which can be charged upon the attorney," *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 397 (1993) (citations omitted), and "the knowledge of [the client's] underlying attorney[] is imputed

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   to [the client] as a matter of law," *Matsuura v. E.I. du Pont de Nemours & Co.*, 330 F. Supp. 2d

2   1101, 1107 n.11 (D. Haw. 2004), *rev'd on other grounds*, 431 F.3d 353 (9th Cir. 2005).  The

3   Government must show that the recordings played for attorneys during plea negotiations did not

4   affect any cooperator's decision to plead guilty.

5          On the merits, the Government misapplies the *Ceccolini* factors.  The first factor asks

6   whether the testimony of the witness was "an act of [his] own free will in no way coerced or

7   even induced by official authority as a result of" the illegal search.  *United States v. Ramirez-*

8   *Sandoval*, 872 F.2d 1392, 1397 (9th Cir. 1989).  The Government claims that, because Rezaian

9   and Rosenbledt agreed to plead guilty and the Court found their pleas knowing and voluntary,

10  the first factor counsels against suppression.  Dkt. 164 at 17.  Not so.  Given that Rezaian and

11  Rosenbledt were unaware that the Government violated the Fourth Amendment and Title III to

12  build the case against them, there is now a serious question whether their pleas were knowing.

13         More importantly, only Rezaian and Rosenbledt can say whether their pleas were induced

14  by the illegal recordings.  The Government claims that the role of the illegal recordings was

15  "minimal," *id.*, yet over twenty-five percent of the audio/video played for Rosenbledt's counsel

16  was from a stationary audio device.  *See* Dkt. 164-21, ¶¶ 15, 17, 19 (0:22 + 1:30, of 7:07 total).

17  The Government tried and failed to obtain affidavits from Rezaian and Rosenbledt stating that

18  their cooperation was not induced by the illegal recordings.  Bauer Decl., Ex. B (Sept. 28, 2016

19  letter) at 4.  Given that failure, it seems unlikely that the Government could ever meet its burden

20  to offer evidence establishing that its witnesses' cooperation was not induced by the illegal

21  recordings.  *See United States v. Ailemen*, 43 F. App'x 77, 82 (9th Cir. 2002) (relying on a

22  witness' declaration to determine whether her testimony was induced by evidence obtained via

23  an illegal wiretap); *United States v. Ghailani*, 743 F. Supp. 2d 242, 259-61 (S.D.N.Y. 2010)

24  (pointing to the government's failure to produce an affidavit from an allegedly tainted witness

25  and ordering an evidentiary hearing at which the government could produce the witness).

26         The second *Ceccolini* factor asks whether the illegally seized evidence was used in

27  questioning the witness.  *Ramirez-Sandoval*, 872 F.2d at 1397.  Here, the answer is clearly yes.

28  Unlike the *Hooten* case cited in the Government's brief, in which the agents did not use the

13

1   illegally seized evidence to refresh any witness' recollection or to pressure any witness to make a

2   statement, counsel for Rosenbledt and Rezaian reviewed the illegal recordings.  *See United*

3   *States v. Hooten*, 662 F.2d 628, 632 (9th Cir. 1981).  And unlike the *Leonardi* case, the

4   recordings shown to Rezaian and Rosenbledt directly implicate them in the alleged conspiracy.

5   *Cf. United States v. Leonardi*, 623 F.2d 746, 752 (7th Cir. 1980) (witness was confronted with

6   his illegally seized driver's license and social security card), *with* Dkt. 164-21, Ex. J (Rosenbledt

7   was confronted with 1D143.001_part3.wav, a conversation during which Rosenbledt states, "I

8   paid Ray," and Rezaian states, "Pay Patrick.  Dan, Ray, Mo.  2000.  Lynbrook.").  Also unlike

9   *Leonardi*, Rosenbledt and Rezaian were not facing substantial jail time relating to other offenses

10  when they were confronted with the illegal recordings.  *See Leonardi*, 623 F.2d at 753.

11          The remaining three factors are neutral, at least on the current record.  The third factor

12  asks whether substantial time elapsed between the unlawful search and the initial contact with

13  the witness.  *Ramirez-Sandoval*, 872 F.2d at 1397.  Although several years passed between the

14  end of the illegal recording program and the Rosenbledt and Rezaian plea negotiation meetings,

15  there is no indication that the passage of time weakened the connection between review of the

16  illegal recordings and the witnesses' decisions to cooperate.  *See United States v. Shetler*, 665

17  F.3d 1150, 1159 (9th Cir. 2011).  Moreover, finding no taint any time law enforcement waits to

18  approach a witness would incentivize agents to conduct illegal searches, knowing they could use

19  the fruits with potential cooperators as long as they waited some period of time.  The fourth

20  factors asks whether the identity of the defendant and the witness were known to the authorities

21  before the illegal search.  *Ramirez-Sandoval*, 872 F.2d at 1397.  While true in this case,[3] it is

22  probably true in many cases, especially more complex and lengthy investigations.  Finally, the

23  fifth factor asks whether there is evidence to suggest that the agents initiated the illegal search

24  with the goal of finding a willing and knowledgeable witness to testify.  *Id.*  The issue is not, as

25  the Government believes, whether Agent Wynar consulted attorneys before setting up the illegal

26

27  [3] The Government admits that Defendants Farag and Appenrodt were not known before the
    illegal recordings commenced, but contends that they were identified through lawful means.

28  Dkt. 164-26, ¶¶ 16(d)-(e).

14

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFS.' RESPONSE TO GOVERNMENT'S
BRIEF RE: USE OF RECORDINGS
CASE NO. CR 14-00534-CRB

1  recording devices outside the courthouse.  *See* Dkt. 164 at 18.  Rather, this factor focuses on the

2  goal of the agents in conducting the illegal search.  *See Shetler*, 665 F.3d at 1160 (holding that a

3  statement is more likely to be tainted when the goal of the illegal search was "purposeful

4  extraction of evidence").  Here, the FBI set up electronic recording devices to "capture additional

5  evidence" of alleged bid-rigging and fraud, and surely "additional evidence" may have included

6  witness testimony.  Def. Ex. 6, ¶ 7.

7        The core question under *Ceccolini* is whether the testimony of the witnesses was induced

8  by the illegal recordings.  Without offering evidence from Rezaian and Rosenbledt themselves,

9  the Government cannot satisfy its burden of proving that their cooperation was not induced by

10  the illegal recordings.  *See Ghailani*, 743 F. Supp. 2d at 261 (ordering an evidentiary hearing, at

11  which the government could produce the potentially tainted witness).

12  **III.    CONCLUSION**

13        For the foregoing reasons, Defendants respectfully request that the Court suppress all

14  evidence collected after the illegal recording scheme began on December 22, 2009, because the

15  Government failed to accurately and completely document its use of the illegal recordings and

16  therefore cannot meet its burden.  In the alternative, Defendants respectfully request that the

17  Court order the following: (1) the Government must specifically identify the evidence that it

18  intends to rely on at trial and establish an untainted chain for each item; (2) the Government must

19  produce all materials not yet disclosed to the defense relating to the use of any illegal recording

20  by any government agent; (3) set a hearing at which Agent Wynar, Agent Bond, and the

21  prosecutors who participated in the investigation of this case will be available for cross-

22  examination; and (4) the Government must produce evidence establishing that the testimony of

23  Rezaian and Rosenbledt was not induced by the illegal recordings.

24  //

25  //

26  //

27  //

28  //

1    DATED: September 30, 2016              Respectfully submitted,

2                                          By  /s/ Ashley M. Bauer
                                               Daniel M. Wall (Bar No. 102580)
3                                              Ashley M. Bauer (Bar No. 231626)
                                               Alicia R. Jovais (Bar No. 296172)
4                                              LATHAM & WATKINS LLP
                                               505 Montgomery Street, Suite 2000
5                                              San Francisco, CA 94111-6538
                                               Telephone: (415) 391-0600
6                                              Fax: (415) 395-8095
                                               dan.wall@lw.com
7                                              ashley.bauer@lw.com
                                               alicia.jovais@lw.com
8

9                                              *Attorneys for Defendant Abraham S. Farag*

10

11                                         By  /s/ Matthew J. Jacobs
                                               Matthew J. Jacobs (Bar No. 171149)
12                                             VINSON & ELKINS LLP
                                               525 Market Street, Suite 2750
13                                             San Francisco, CA 94105
                                               Telephone: (415) 979-6990
14                                             Fax: (415) 651-8786
                                               mjacobs@velaw.com
15

16                                             *Attorney for Defendant Joseph J. Giraudo*

17                                         By  /s/ Louis P. Feuchtbaum
                                               Louis P. Feuchtbaum (Bar No. 219826)
18                                             SIDEMAN & BANCROFT LLP
                                               1 Embarcadero Center, 22nd Floor
19                                             San Francisco, CA 94111
                                               Telephone: (415) 392-1960
20                                             Fax: (415) 392-0827
                                               lfeuchtbaum@sideman.com
21

22                                             *Attorney for Defendant Raymond A. Grinsell*

23

24   //

25   //

26   //

27   //

28   //

16

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFS.' RESPONSE TO GOVERNMENT'S
BRIEF RE: USE OF RECORDINGS
CASE NO. CR 14-00534-CRB

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

By  /s/ Nanci Clarence
    Nanci Clarence (Bar No. 122286)
    CLARENCE DYER & COHEN LLP
    899 Ellis Street
    San Francisco, CA 94109
    Telephone: (415) 749-1800
    Fax: (415) 749-1694
    nclarence@clarencedyer.com


    *Attorney for Defendant Raymond A. Grinsell*


By  /s/ Doron Weinberg
    Doron Weinberg (Bar No. 46131)
    LAW OFFICES OF DORON WEINBERG
    523 Octavia Street
    San Francisco, CA 94102
    Telephone: (415) 431-3472
    Fax: (415) 552-2703
    doronweinberg@aol.com


    *Attorney for Defendant Kevin B. Cullinane*


By  /s/ Jeffrey L. Bornstein
    Jeffrey L. Bornstein (Bar No. 99358)
    ROSEN BIEN GALVAN & GRUNFELD LLP
    50 Fremont Street, Floor 19
    San Francisco, CA 94105
    Telephone: (415) 433-6830
    Fax: (415) 433-7104
    jbornstein@rbgg.com


    *Attorney for Defendant James F. Appenrodt*


## CIVIL LOCAL RULE 5-1(i)(3)

Pursuant to Civil Local Rule 5-1(i)(3), I attest that concurrence in the filing of this

document has been obtained from each of the other Signatories hereto.


    /s/ Ashley M. Bauer
    Ashley M. Bauer
    Attorney for Defendant Abraham S. Farag

17

DEFS.' RESPONSE TO GOVERNMENT'S
BRIEF RE: USE OF RECORDINGS
CASE NO. CR 14-00534-CRB